### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

### v.

### ENERGY GROUP OF AMERICA, INC., Edwin G. Axel, Defendants.

### No. 77 Civ. 3187.

United States District Court, S. D. New York.

Sept. 21, 1978.

William D. Moran, Regional Administrator, U. S. Securities and Exchange Commission, New York City, Michael T. Gregg, New York City, for S. E. C.

Schnitzer & Schnitzer, Morris M. Schnitzer, Lowy & Levine, John B. Lowy, Newark, N. J., for defendants.

## MEMORANDUM DECISION

STEWART, District Judge:

The Securities and Exchange Commission ("SEC") has filed a complaint charging the defendants, Energy Group of America ("EGA") and its president and sole stockholder, Edwin G. Axel ("Axel"), with violations of various provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and rules promulgated thereunder. The SEC seeks an injunction against the continuing sale and offering for sale of unregistered securities, an injunction against fraudulent practices connected therewith, disgorgement of monies already realized from those practices, and, pending trial on the merits, a preliminary injunction, which is the subject of this opinion.

EGA solicits customers, through advertising and direct mailing, to utilize its services in connection with oil and gas lease lotteries conducted by the Department of the Interi-

or, Bureau of Land Management ("BLM"). Oil and gas leases are awarded by BLM by two methods: when the lease pertains to land that is located on a geologic structure known to be oil or gas-producing, the lease is awarded by competitive bidding; on other lands, that is, lands not on a geologic structure which contains a producing oil or gas field, ten-year leases are awarded on a non-competitive basis at an annual rental of one dollar per acre per year. The relatively low rental and the oil and gas producing potential of the lands generate a high demand for the non-competitive leases, so much so that BLM awards the leases through a public drawing, or lottery, known as the Simultaneous Oil and Gas Lease Filing System. A monthly listing of leases available in each state is published by BLM, and for a ten-dollar entry fee, members of the public may participate in the drawing. The winner of a lease, if he or she wishes to retain the lease, must pay in advance the first year's rental, and thereafter pay the annual rental as it falls due. The lease may be sold or assigned and a royalty of up to 5% retained. The federal government receives a 12.5% royalty on production, regardless of whether the lease is sold or assigned.

In its promotional literature, EGA explains the BLM leasing program, stresses the potential windfall awaiting a winner of a lease, and represents that it possesses expertise in selecting which of the parcels offered by BLM warrants a bid. EGA confines its recommendations to Wyoming and New Mexico parcels, states in which EGA claims to have its best research resources. For a ten-dollar fee, EGA offers the following services to its customers:

1. A monthly listing of parcels it expects to be subject to BLM public drawing, based on expirations of existing ten-year leases. This is a valuable service, EGA claims, because it gives EGA customers more time to select and enter non-competitive bids on parcels than the normal five days between BLM listing and the entry deadline. If a parcel selected by a customer from EGA's list is not offered by BLM, EGA will substitute a parcel of equivalent value on the customer's application.

2. EGA claims to possess expertise in selecting parcels on which to bid, and lists in its monthly listing six to ten recommended parcels in each state, an amount that EGA will pay for each lease it recommends should that lease be won, and the expected number of applicants for each lease.

3. EGA fills out and submits the BLM entry card on behalf of the customer.

4. If a customer wins a lease, EGA pays the first year's rental, with the understanding (not a legally-enforceable agreement) that it is to be repaid when the customer sells or assigns the lease or when the property produces oil or gas.

5. EGA offers, if the customer requests the service, to notify the winner of any inquiries EGA receives concerning sale of the lease.

6. EGA stands ready to purchase the lease from the winner at the price at which it valued the lease on the monthly listing.

The SEC contends that in providing this combination of services, EGA is offering for sale and selling an unregistered "security" within the meaning of Section 2(1) of the Securities Act,[1] 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10), in violation of

---

1. The definitions of a "security" in § 2(1) of the 1933 Act and in § 3(a)(10) of the 1934 Act are "virtually identical". *Tcherepnin v. Knight*, 389 U.S. 332, 335 36, 88 S.Ct. 548, 552, 553, 19 L.Ed.2d 564 (1967). § 2(1) reads as follows:

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

the registration provisions, Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e. The SEC also claims that the anti-fraud provisions of that Act, 15 U.S.C. § 77q(a), and of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rules pursuant thereto, have been violated since EGA's literature is misleading in its commissions and omissions.

A hearing was held in September, 1977 to determine whether a preliminary injunction should issue. Decision on the motion for a preliminary injunction was reserved pending the submission of briefs on the question of whether EGA's promotional literature and services constitute an investment contract.

■■■ We begin with the principle that remedial legislation, such as the Securities Act and the Securities Exchange Act, should be construed broadly to effectuate its purposes. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). We also recognize that the application of these statutes to a particular transaction turns not on the form but on the economic realities underlying the transaction. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975); *accord, Tcherepnin v. Knight, supra*, 389 U.S. at 336, 88 S.Ct. 548; *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) ("*Howey*"). However, whether these statutes are to be applied to a transaction is tested not by the desirability of regulation, but by whether such application will fulfill the statutory purpose of "compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security'." *Howey, supra*, 328 U.S. at 299, 66 S.Ct. at 1103; *see S. E. C. v. Variable Annuity Life Insurance Co. of America*, 359 U.S. 65, 80, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (Brennan, J., concurring). It is noteworthy that the SEC has taken the position in its responses to requests for "no action" letters that services such as those offered by EGA do constitute investment contracts and thus are subject to the registration requirements of the securities statute and regulation by the SEC. However, while the position of the adminis-trative agency charged with the enforcement of and promulgation of regulations under a statute is entitled to substantial weight, it is not conclusive. *Zeller v. Boque Electric Mfg. Corp.*, 476 F.2d 795, 800 (2d Cir. 1973). *See Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974). With these principles in mind, we turn to the SEC's arguments that EGA is offering an investment contract.

■■■ The landmark Supreme Court cases which expanded the definitions of a security and an investment contract beyond their traditional embodiments, *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) ("*Joiner*"), and *SEC v. W. J. Howey Co., supra*, are relied on here by the SEC in its argument that those definitions should also encompass the offerings of EGA. The SEC's argument based on *Joiner* lies generally in the proposition that EGA, in its panoply of offered services, holds itself out to the public as providing more than a simple service to BLM lottery entrants. The court in *Joiner* went beyond traditional, formalistic notions of what constitutes a "security" to find that:

> [n]ovel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as [a] matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts", or as "any interest or instrument commonly known as a 'security'."

*SEC v. Joiner Leasing Corp., supra*, 320 U.S. at 351, 64 S.Ct. at 124. The test of whether an offering is a security requires consideration of the "character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.*, 320 U.S. at 352–53, 64 S.Ct. at 124. Applying this test, the Court found that Joiner's sale of leases on land nearby or adjacent to a parcel of land on which, the promotional literature claimed, an exploratory oil well would be drilled by Joiner, constituted the sale of securities. Applying the *Joiner* test to the facts of this case, we

cannot say that the services offered and performed by EGA amount to a security. First, while EGA's promotional literature speaks in terms of both an "investment" and a "gamble", the overall intent of the literature is to encourage readers to participate in a lottery, where the odds are greatly against them, and to utilize the services of EGA in so doing. The character of the offering emerges as an offer to assist the customer in making a gamble or a bet, with the possible winnings greatly in excess of the amount wagered.[2] Second, there is no "plan of distribution" since no capital is placed in the hands of an enterprise with the expectation of a return on investment. A customer pays EGA a ten-dollar fee, in return for which is received certain services; if the customer wins a lease, EGA stands ready to purchase it at a given price, or the winner is free to seek purchasers on his or her own. There is no distribution of profits or earnings, only a windfall if a lease is won. Finally, the inducement held out to the prospect is the potential of large winnings if a lease is won in the BLM drawing. It is an inducement to participate in a lottery, a game of chance, not to invest capital in order to realize a return over time. The SEC argues that EGA's guarantee to purchase at the stated price any lease that is won is a promise of a return on the entrant's ten-dollar fee paid to EGA, and, thus, an inducement to invest. This reasoning ignores the fact that the return is wholly contingent upon the winning of a lease in the lottery—a contingency which we think (and there has been no showing to the contrary) distinguishes this offering from an investment in the mind of a reasonable person. No one reasonably expecting a return on his or her capital would enter the BLM lottery via EGA to achieve that goal. A reasonable expectation of profit to be derived from the entrepreneurial or managerial efforts of others is an essential feature of an investment contract, *United Housing Foundation, Inc. v. Forman, supra,*

421 U.S. at 852, 95 S.Ct. at 2060, certainly missing in this case. Therefore, based on "the economic reality and the totality of circumstances", *Glen-Arden Commodities, Inc. v. Costantino,* 493 F.2d 1027, 1034 (2d Cir. 1974) (citing *Joiner*), surrounding EGA's services, we find that EGA is neither offering for sale nor selling a "security" as defined by the court in *Joiner.*

■ Analysis under *Howey, supra,* yields the same result. Although an investment contract "embodies a flexible rather than a static principle", *SEC v. Howey Co., supra,* 328 U.S. at 299, 66 S.Ct. at 1103, it is subject to limitations expressed by the Court. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.,* 328 U.S. at 301, 66 S.Ct. at 1104. The SEC argues that EGA's "scheme" meets the three prongs of the *Howey* test: (1) an investment (2) in a common enterprise (3) with profits to come solely from the efforts of others.

■ First, the SEC contends, the ten-dollar fee paid to EGA satisfies the requirement that there be an "investment of money". It strains the ordinary meaning of words to consider the payment of a fee an investment. An "investment" typically involves parting with money for the purpose and in the reasonable expectation of making a profit. *Compare SEC v. Brigadoon Scotch Dist. Ltd.,* 388 F.Supp. 1288, 1291 (S.D.N.Y.1975) *with United Housing Foundation, Inc. v. Forman, supra,* 421 U.S. at 852, 95 S.Ct. at 2060. No capital contribution is intended nor is a return on capital anticipated when a customer pays the fee—the customer seeks only to avail himself of EGA's services. Second, the SEC argues that the services provided by EGA in return for the fee makes this a "common enterprise". This and the third prong of the test, that "profits . . . come solely

---

**2.** It is not without significance that, of the two customers of EGA called as witnesses by the SEC, one readily agreed on cross-examination that he considered entry into the lottery as "a gamble, a bet", Record at 47, 65, while the other accepted defense counsel's characterization of the entry fee as a "$20 bet." Record at 86–87. Neither of the witnesses testified that he or she considered the twenty-dollar fee an investment.

from the efforts of others", present issues that are common to both, and thus we will treat them together.

In *Howey*, investors were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." *Id.*, 328 U.S. at 299, 66 S.Ct. at 1103. In assessing whether the scheme in *Howey*, which included a contract for the sale of a small portion of a citrus grove, a warranty deed on the property and a service contract, was an investment contract, and in determining that it was, the Court found that

> . . . all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise.

*Id.*, 328 U.S. at 300, 66 S.Ct. at 1104. None of these elements, which combine the "common enterprise" and "profit" portions of the *Howey* test, *supra*, is present here. Customers of EGA do not contribute capital to any enterprise with the intention of sharing in its profits and earnings—they merely pay a fee for which certain services are provided in return. Initially, customers receive the benefit of EGA's purported expertise in selecting parcels on which to bid. Should they win a lease, they can take advantage of EGA's offer to purchase the lease from them at the stated price. In both instances, the dealings between each customer and EGA are arm's length transactions.[3] And, considering the services as a whole, there is no common ownership of any enterprise and no entrusting of the enterprise to the management of others. The economic fate of any one customer is completely independent of that of any other

customer and, more important, of EGA. Thus, we fail to see any common enterprise in the facts of this case.

It may be true that EGA plays some role in the success of an individual customer in winning a lease, in that EGA recommends parcels on which to bid, but that role falls far short of fulfilling the requirement in *Howey, supra*, that "profits  . . . come solely from the efforts of others", or even that the efforts of others "are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise". *SEC v. Glenn W. Turner Enterprise, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). Whatever "profits" are realized in this case are the direct result of the entrant's selecting a parcel (albeit with EGA's assistance), submitting his entry through EGA, and winning a lease which can then be liquidated. Profits are a matter of luck, not managerial effort or entrepreneurial skill. What primarily affects the failure or success of the enterprise, assuming there is one, is not EGA's "essential managerial efforts", *id.*, but the luck of the draw. The skill of EGA in selecting the recommended parcels has no effect whatsoever unless a customer wins a lease, an occurrence totally outside of EGA's control. Under the circumstances, EGA's role in the success of the enterprise, limited as it is to recommending parcels on which to bid, with the rest left to chance, can hardly be said to be essential managerial or entrepreneurial efforts.

The SEC argues that a critical ingredient in EGA's package is the offer to purchase any recommended lease that is won, thereby guaranteeing liquidability, citing *Glen-Arden Commodities, Inc. v. Costantino, supra*, 493 F.2d at 1035. There, investors purchased small quantities of Scotch whis-

---

3. The United States District Court for the Northern District of Illinois, Eastern Division, in an unpublished opinion, dismissed the complaint (with leave to amend) of a customer of a filing service substantially similar to EGA in its operation. On the facts alleged in the complaint, the Court found that the *Howey* test of a

common enterprise was not met, that there was no pooling of funds, and that "[t]he transaction was an arm's length sale of a lease by plaintiff to defendants." *Vasquez v. Max Wilson, Inc.*, 77 C 3071 at p. 3 (N.D.Ill., E.D., Feb. 22, 1978).

key, in the form of warehouse receipts, relying on Glen-Arden's expertise in selecting, storing and aging the Scotch. The Court, in finding that this was an investment contract rather than a purchase of a commodities future, and in distinguishing one from the other, noted the importance to the customer of Glen-Arden's offer to purchase the Scotch from the customer if it should prove impossible to find another buyer. Particularly in the absence of a market for small quantities of Scotch, the buy-back arrangement was "crucial to any customer's hope to liquidate his investment". *Id.* That is not the case here. While it may be difficult for a person with no experience in the oil and gas business to sell a lease on his or her own, and while it may be an important incentive to the customer that EGA offers to buy any recommended lease that is won, there nevertheless is a market for the lease and an opportunity to liquidate the "investment" independent of EGA, an opportunity unavailable to the investors in *Glen-Arden*. Thus, if the customer sells the lease not to EGA, but on the market, he or she is not at all dependent upon EGA for his or her profits. We conclude, therefore, that EGA's scheme fails to meet the test of an "investment contract" set forth in *Howey, supra.*

In summary, all of the cases cited to us by the SEC and all of the cases discovered in our own research dealing with types of investment contracts can be categorized either as cases where investors contributed capital to an enterprise expecting a participation in earnings resulting from the use of their funds, or as cases where tangible or intangible property was purchased by the investor in the expectation that it would appreciate in value, either because of the promoter's expertise in selecting the property or because of the promoter's managerial or entrepreneurial efforts subsequent to the purchase of the property. *See, United Housing Foundation, Inc. v. Forman, supra,*

421 U.S. at 852, 95 S.Ct. at 2060. The facts of this case fit neither of these categories.

Accordingly, the SEC's motion for preliminary injunction should be denied. The standard is statutory, requiring the SEC to make a "proper showing" that the defendant "is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of [the Act relating to domestic securities]." Securities Act of 1933, § 20(b), 15 U.S.C. § 77t(b). In deciding whether to issue an injunction, "[t]he critical question for the court . . . is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby." *Securities and Exchange Commission v. Culpepper*, 270 F.2d 241, 249 (2d Cir. 1959), quoted in *SEC v. Broadwall Securities, Inc.*, 240 F.Supp. 962, 967 (S.D.N.Y.1965). Since we think, on the showing made thus far, that EGA is not engaged in selling or offering for sale a "security" within the meaning of either the Securities Act or the Securities Exchange Act, no violation of the Acts has occurred, nor will a violation occur by reason of EGA's continuing its present practices. The SEC has, therefore, not made a "proper showing" entitling it to a preliminary injunction.[4]

The foregoing shall constitute findings of fact and conclusions of law. F.R.Civ.P. 52(a).

SO ORDERED.

---

4. We, of course, express no opinion on whether EGA and Axel are engaged in a fraudulent activity within the enforcement powers of any other federal agency.