SCHWARTZ, Chief Judge.
Several of the respondents below seek review of an “immediate final” order en *1012 tered against them[1] by the State Comptroller in his capacity as head of the Department of Banking and Finance, Division of Securities. The order required that they cease and desist from selling “programs” or “packages” which involve applications for participation in lottery-type drawings for federal oil and gas leases then[2] being conducted monthly by the United States Department of the Interior. The entire basis of the authority asserted by the Comptroller lies in the claim that the plan being offered by the appellants is an “investment contract” and therefore a “security” within the meaning of Sec. 517.021(15), Fla.Stat. (1981).[3] We do not agree that this is the case and therefore reverse the order below.
The programs involved in this case are in all material respects[4] identical to those considered in SEC v. Energy Group of America, Inc., 459 F.Supp. 1234 (S.D.N.Y.1978), which specifically held that they were not “securities” under provisions of the federal Securities Act which are indistinguishable from ours. We agree with, adopt and follow Energy Group in the instant case. It is neither profitable nor necessary to expend judicial resources[5] by replicating, restating, or paraphrasing *1013 the reasoning in Energy Group with which we entirely agree. We do note, however, that it is in accord both with what are apparently the only other judicial decisions on the precise point, Vasquez v. Max Wilson, Inc., Case no. Civ. A. 77C3071 (N.D.Ill., Feb. 22, 1978); and Michigan Department of Commerce v. Engle, Blue Sky L.Rep. (CCH) 1171,540 (Mich.Cir.Ct.1979),[6] and with the thrust of previous analogous opinions of this and other Florida courts in the securities area. Blacker v. Shearson Hayden Stone, Inc., 358 So.2d 1147 (Fla. 3d DCA 1978), cert. denied, 367 So.2d 1122 (Fla.1979); Rudd v. State, 386 So.2d 1216 (Fla. 5th DCA 1980), rev. denied, 392 So.2d 1380 (Fla.1981); Brown v. Rairigh, 363 So.2d 590 (Fla. 4th DCA 1978); see Villeneuve v. Advanced Business Concepts Corp., 730 F.2d 1403 (11th Cir.1984); Sunshine Kitchens v. Alanthus Corp., 403 F.Supp. 719 (S.D.Fla.1975). In our view, the scheme before us is more akin to an elaborate touting and bet-running service than a security. More formally put, it fails to meet any of the three prongs of the familiar test of SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946),[7] let alone, as is required, all three.[8]
On this basis,[9] the order is reversed with directions that the proceeding be dismissed.
Reversed.

. The order was entered on an entirely ex parte basis without taking testimony, avowedly pursuant to Sec. 120.59(3), Fla.Stat. (1981).

. The system has since been suspended.

. § 517.021(15), Fla.Stat. (1981):
"Security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, whiskey warehouse receipt or other commodity warehouse receipt, or right to subscribe to any of the foregoing; certificate of interest in a profit-sharing agreement or the right to participate therein; certificate of interest in an oil, gas, petroleum, mineral, or mining title or lease, or the right to participate therein; collateral trust certificate, reorganization certificate, preorganization subscription, or any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings; interests in or under a profit-sharing or participation agreement or scheme, or any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, certificate, or receipt for a security or for subscription to a security.
The plans were admittedly not registered as securities under Sec. 517.07 and the appellants were not registered as dealers under Sec. 517.12. In addition, it was alleged — and denied — that false representations were involved in the actual sales of the programs. Secs. 517.301, 517.311. Obviously, none of these provisions apply if, as we hold, no "security” is involved.

. At 459 F.Supp. 1237, the package involved there is described as follows:
EGA offers the following services to its customers:
1.A monthly listing of parcels it expects to be subject to BLM [Bureau of Land Management] public drawing, based on expirations of existing ten-year leases. This is a valuable service, EGA claims, because it gives EGA customers more time to select and enter noncompetitive bids on parcels than the normal five days between BLM listing and the entry deadline. If a parcel selected by a customer from EGA's list is not offered by BLM, EGA will substitute a parcel of equivalent value on the customer’s application.
2. EGA claims to possess expertise in selecting parcels on which to bid, and lists in its monthly listing six to ten recommended parcels in each state, an amount that EGA will pay for each lease it recommends should that lease be won, and the expected number of applicants for each lease.
3. EGA fills out and submits the BLM entry card on behalf of the customer.
4. If a customer wins a lease, EGA pays the first year’s rental, with the understanding (not a legally-enforceable agreement) that it is to be repaid when the customer sells or assigns the lease or when the property produces oil or gas.
5. EGA offers, if the customer requests the service, to notify the winner of any inquiries EGA receives concerning sale of the lease.
6. EGA stands ready to purchase the lease from the winner at the price at which it valued the lease on the monthly listing.
The distinction between that case and this are immaterial. We hardly think it makes a principled difference that the seller’s fee in Energy Group was $10, while the one involved here is $125, particularly in the light of the fact that the government’s filing fee was also raised from the $10 then in effect to $75. On the other hand, that under the present plan, the respondents agree only to contribute $25,000 to a successful bidder who does not secure a satisfactory offer for his lease, rather than, as in Energy Group, to purchase the lease outright, if anything militates against the conclusion that the present plan is a security.

.We do not comment on whether, as is often said, these resources may be accurately characterized as either "precious” or "sparse.”

. The appellee relies solely on the opinions of its administrative counterparts in other states, especially In re Overthrust Mineral Corp., Blue Sky L.Rep. (CCH) ¶ 71,849 (Wyo.Sec.Div.1983). It is to be noted, however, that even Overthrust states at 70,096:
As a final matter concerning the general partnership interests offered by Contestants, it should be noted that none of three cases found and cited earlier, i.e., SEC v. Energy Group of America, Inc., 459 F.Supp. 1234 (S.D.N.Y.1978); Vasquez v. Max Wilson, Inc., Civ.A. 77C3071 (N.D.Ill. Feb. 22, 1978); and Michigan Department of Commerce v. Engle, 1978-81 Decisions, CCH Blue Sky Law Reports ¶ 71,540 (Mich.Cir.Ct.1979), which ruled that lease lottery services did not constitute securities, involved the use of general partnership interests.
This fact alone clearly distinguishes the present case and seriously limits the applicability of those cases to the general partnership interests offered by the Contestants.
Like Energy Group, but unlike Overthrust, no general partnership interests are involved in the case at bar.

. The test of an investment contract, as formulated by the Court, is "whether the scheme involves [1] an investment of money [2] in a common enterprise with [3] profits to come solely from the efforts of others.” 328 U.S. at 301, 66 S.Ct. at 1104.

. It is obvious that we do not decide whether the scheme is one which should be the subject of state authority of the type proposed here. As Energy Group says:
... whether these statutes are to be applied to a transaction is tested not by the desirability of regulation, but by whether such application will fulfill the statutory purpose of "compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security'." Howey, supra, 328 U.S. at 299, 66 S.Ct. at 1103.
459 F.Supp. at 1238.
Moreover, even though our decision precludes the application of Florida’s securities law, if, as the appellee contends, fraudulent practices are involved, a whole panoply of civil and criminal remedies remain available for effective and timely prevention and punishment. E.g., Sec. 501.201, et seq., Fla.Stat. (1981) (Little FTC Act.)

.We need not and do not pass upon any of the other grounds for reversal argued by the appellants, including the far from unsubstantial ones that the procedure involved below is not statutorily authorized in these circumstances, see State of Florida, Department of Banking and Finance, ex rel Lewis v. Standard Federal Savings and Loan Ass'n, 452 So.2d 105 (Fla. 1st DCA 1984); Commercial Consultants Corp. v. State of Florida, Department of Business Regulation, 363 So.2d 1162 (Fla. 1st DCA 1978); that the imposition and long-standing duration of the ex parte order deprived them of due process, see Aurora Enterprises, Inc. v. State of Florida, Department of Business Regulation, 395 So.2d 604 (Fla. 3d DCA 1981); and that the attempted regulation of transactions with customers who reside only outside of Florida contravenes the commerce clause. Art. I. Section 8, United States Constitution. See Edgar v. Mite Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).