950 P.2d 249

**STATE of Idaho, DEPARTMENT OF FINANCE, Plaintiff–Respondent,**

v.

**RESOURCE SERVICE CO., INC., a Wisconsin Corporation, Fred L. Engle, and their agents and representatives, Defendants–Appellants.**

No. 22211.

Supreme Court of Idaho,
Boise, December 1996 Term.

Sept. 2, 1997.

Rehearing Denied Feb. 5, 1998.

Ormiston, Korfanta, Dunbar & Holland, Steven R. Ormiston; Eberle, Berlin, Kading, Turnbow & McKlveen, Chtd., Richard A. Riley, Boise, for Defendants–Appellants.

Alan G. Lance, Attorney General; Michael J. McDonagh, Deputy Attorney General, Boise, for Plaintiff–Respondent.

SCHROEDER, Justice.

Resource Service Co., Inc. (RSC) appeals from an order of the district court granting summary judgment in favor of the Idaho Department of Finance (Department) based upon a determination that RSC was market-, ing a security in violation of various provisions of the Idaho Securities Act (Act). I.C. §§ 30–1401 to 30–1458.

RSC solicited a $40.00 fee from customers to enter their names in a Bureau of Land Management (BLM) lottery for gas and oil leases. A portion of the payment was profit to RSC for preparing and filing customer applications in the lottery, and a portion was combined with like payments from nineteen (19) other customers and applied to the payment of a $75.00 filing fee and advance lease payment on government-owned lands. The program was marketed as having the potential for obtaining valuable oil and gas reserves. The district court determined that RSC was marketing an "investment contract" constituting a security and granted summary judgment to the Department on various claims.

I.

BACKGROUND

RSC is a Wisconsin based business that provides services related to the application for noncompetitive oil and gas lease drawings. The U.S. Department of the Interior, through the BLM, is responsible for leasing oil and gas exploration and development rights. 43 C.F.R. § 3100. The BLM issues two types of leases—competitive and non-competitive. Parcels of land are offered for lease at auctions for competitive bids. If a parcel fails to receive an adequate bid, a noncompetitive lease may be issued on that parcel. Offers for noncompetitive leases are for eighty (80) acre tracts and must be submitted on a BLM-approved form. A $75.00 filing fee, plus the first year's advance rent of $1.50 per acre, must accompany the application. Priority among offers received on noncompetitive leases is on a first-come, first-serve basis. Priority on offers received the same day is determined by random drawing. A successful applicant acquires the right to explore, drill, extract and dispose of oil and gas deposits found on that parcel.

RSC groups customers together, files an application on their behalf, and provides customers with information regarding the filings including parcel and lease numbers, legal descriptions, and filing status. To promote its services RSC mailed Idaho residents unsolicited correspondences. In the summer of 1990, Gloria Holt (Holt) received correspondence from RSC containing its promotional materials.

Holt is typical of a prospective RSC client who first received a letter encouraging him or her to purchase RSC's services because, "[a]s a participant, you may have the good fortune of being rewarded beyond your wildest dreams for the successful exploration of oil and/or gas on the land that you acquire an interest in." The letter encouraged a quick response because "potentially attractive lands are limited and ALL applications are handled on a first-come, first-service basis." Three enclosures were included with the initial solicitation letter. The first enclosure provided information on the BLM leasing

program in Wyoming and also information on RSC. The second enclosure, captioned "Actual Cash paid to RSC Clients for Federal Oil & Gas Lease Rights Sold to Giants of the Oil Industry ...," provided a list of cash royalties paid to more than one hundred RSC clients. The last enclosure was a photocopy of an actual oil production and royalty income check for $10,494.00 made payable to RSC. Recipients of RSC's initial promotional material were informed that they could receive RSC's services by paying a $40.00 fee and signing a Service Agreement. The Service Agreement was not included in the initial materials but was sent only after the prospective customer remitted $40.00. After applicants paid $40.00 to RSC, they received a confirmation letter and the Service Agreement.

The confirmation letter indicated that participants would have no other financial obligation except a requirement to pay "a like amount of $40.00 each year until the oil and gas lease rights you acquire an interest in are sold to an oil company." The letter also provided that should the participants wish to discontinue participation in the program they could do so prior to any future anniversary date without further obligation.

The Service Agreement explains that the BLM allows lease offers to be filed in the name of only one individual and that RSC combines offerees into groups of twenty (20) members with one individual designated as the "Primary Applicant." The Primary Applicant must acknowledge that the other nineteen (19) members of the group are entitled to equal 1/20th interests in any lease rights obtained. The Service Agreement disclaims any guarantee that a lease will be acquired or that any successful lease application will result in profit to the customer. The Service Agreement reads further: "The obtaining of a lease and any potential value thereof are speculative matters of chance and risk."

After sending in $40.00 and signing the Service Agreement, RSC customers received three chances at a 1/20th interest in an eighty (80) acre noncompetitive lease. If the first application was not successful, RSC automatically submitted a second application, and if the second application was not successful, RSC submitted a third. RSC customers were also sent additional opportunities to participate in "optional additional programs" involving larger interests in leases. If a customer acquired an interest in a lease, he or she was free to dispose or develop the interest in any manner he or she deemed appropriate.

## II.

## PRIOR PROCEEDINGS

On April 30, 1991, the Department filed a complaint against RSC and its president, Fred Engle (Engle), alleging violations of the Act. Although Holt received a full refund from RSC and is not a party in this case, her experiences with RSC's program prompted the Department to initiate this suit. The parties filed cross motions for partial summary judgment on the issue of whether RSC's program constituted a "security." RSC's motion for partial summary judgment was denied and the Department's motion was granted. Summary judgment was later granted in favor of the Department.

In its Memorandum Decision granting summary judgment, the district court determined that RSC had violated I.C. § 30–1406, related to the sale of securities in the state by unregistered broker-dealers, and I.C. § 30–1416, related to the sale of unregistered securities in the state, and I.C. § 30–1403(2) and (3) which contains the anti-fraud provisions of the Act. The district court concluded that a question of material fact remained as to whether RSC had violated I.C. § 30–1438, related to making misleading statements in connection with an investigation for violations of the Act. The Department later moved to dismiss this part of its claim and the parties stipulated to a $5,000 civil penalty to be imposed against RSC and Engle for violations of the Act. The district court permanently enjoined the defendants from offering or selling non-exempt securities, or employing broker-dealers to do so, or making any untrue statements or engaging in conduct operating as a fraud in the sale of a security, or selling exempt securities in the state without written notice to the Depart-

ment. The district court also ordered RSC to pay refunds to each person within the state from whom they had obtained money.

The district court denied RSC's motion for reconsideration in which RSC argued that application of the term "investment contracts" as to its program is unconstitutionally vague. RSC appeals this determination and the court's determination that its program constitutes the sale of securities. Engle appeals the court's determination that he is personally liable pursuant to I.C. § 30–1442(3) for any violations of the Act by RSC.

## III.

### STANDARD OF REVIEW

On appeal from an order granting summary judgment this Court's standard of review is the same as that properly employed below. *Friel v. Boise City Hous. Auth.*, 126 Idaho 484, 485, 887 P.2d 29, 30 (1994). Summary judgment is proper if the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c).

■ The question of whether a transaction constitutes a "security" has been interpreted both as a question of fact, *In re Longhorn Sec. Litigation*, 573 F.Supp. 255, 266 (W.D.Okla.1983) (citing *Crowley v. Montgomery Ward and Co.*, 570 F.2d 875, 877 (10th Cir.1975)); *see Dumbarton Condominium Ass'n v. 3120 R St. Assoc. Ltd. Partnership*, 657 F.Supp. 226, 229 (D.D.C.1987), and a question of law, *Sheets v. Dziabis*, 738 F.Supp. 307, 308 n. 1 (N.D.Ind.1990); *Wright v. Schock*, 571 F.Supp. 642, 653 (N.D.Cal. 1983) (citing *United States v. Carman*, 577 F.2d 556, 562 (9th Cir.1978)); *Ahrens v. American–Canadian Beaver Co.*, 428 F.2d 926 (10th Cir.1970). *See* 3 BLOOMENTHAL, SECURITIES AND FEDERAL CORPORATE LAW, § 2.04[9] (1991). This Court agrees with those jurisdictions holding that, although characterization of a transaction raises ques-

tions of both law and fact, the ultimate issue of whether a particular set of facts constitutes an investment contract is a question of law. *Carman*, 577 F.2d at 562. This Court reviews questions of law de novo. *Thornock v. Boise Indep. Sch. Dist. 1*, 115 Idaho 466, 470, 767 P.2d 1241, 1245 (1988).

## IV.

### THE DISTRICT COURT WAS ENTITLED TO RESOLVE CONFLICTING INFERENCES FROM THE UNDISPUTED FACTS.

The first question is whether the district court used a proper standard of review in relying on the standard set forth in *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657 (1982), in which the Court held that a judge, sitting without a jury, could determine an ultimate issue of waiver on summary judgment where the parties had filed cross-motions for summary judgment effectively stipulating that the evidentiary facts were not in dispute. In that case, the Court explained that if a jury is to be the finder of fact, it would be improper to grant summary judgment on undisputed facts if conflicting inferences could be drawn from those facts and reasonable people might reach different conclusions. The Court then stated:

> Nevertheless, where the evidentiary facts are not disputed and the trial court rather than a jury will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will be responsible for resolving the conflict between those inferences.

*Id.* at 519, 650 P.2d at 661.

■ RSC argues that the district court erred in granting the Department's motion for summary judgment. RSC claims that instead of *Ritchie*, the district court should have applied the rule set forth in *City of Chubbuck v. City of Pocatello*, 127 Idaho 198, 899 P.2d 411 (1995).[1] Instead of resolving the conflicting inferences, RSC argues that

---

1. The standard of review in *City of Chubbuck* was stated as follows:

    The standard applied when ruling on or reviewing the ruling on a motion for summary

judgment is not lessened simply because both parties have moved for summary judgment. *Kromrei v. AID Ins. Co.*, 110 Idaho 549, 551, 716 P.2d 1321, 1323 (1986); *Farmer's Ins. of*

the district court should have drawn reasonable inferences in its favor and denied the Department's motion for summary judgment.

■ There was no timely jury request in this case.[2] The parties made cross-motions for summary judgment on the issue of whether RSC's program was correctly characterized as an "investment contract," which issue involves a question of law. The parties did not dispute the definition of an "investment contract" or any of the evidentiary facts in the case. The parties also disputed whether it was "reasonable" for RSC customers to believe they were "investing" or to expect a profit. Reasonableness is an ultimate factual determination the district court was entitled to make according to the *Ritchie* standard because the court alone was responsible for resolving the conflicting inferences arising from undisputed facts.

## V.

## RSC'S PROGRAM DOES NOT CONSTITUTE AN "INVESTMENT CONTRACT".

### A. "Investment Contract"

Section 30–1402(12) of the Idaho Code defines a "security" as:

> *Idaho v. Brown,* 97 Idaho 380, 381–82, 544 P.2d 1150, 1151–52 (1976). However, when both parties move for summary judgment on the same issues and legal theories based on the same, essentially uncontroverted facts, the record is unlikely to reveal any genuine issue of material fact.... In order to determine whether either party is entitled to summary judgment, this Court must examine each motion separately, reviewing the record and the reasonable inferences that can be drawn from it in favor of each party's opposition to the motions for summary judgment.

127 Idaho at 200–01, 899 P.2d at 413–14 (citation omitted).

This language was quoted in *V-1 Oil v. Petroleum Clean Water Trust,* 128 Idaho 890, 892, 920 P.2d 909, 911 (1996). The standard set forth in *City of Chubbuck* is proper when the parties submit cross motions for summary judgment on differing theories or facts, or when a jury could draw differing inferences from the undisputed facts. Neither *City of Chubbuck* nor *V-1 Oil* distinguish *Ritchie.*

In those circumstances where no jury has been requested and the facts are to be tried to the court, if the evidentiary facts are not in dispute, the trial court may grant summary judgment

[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract....*

I.C. § 30–1402(12) (emphasis added).

This statutory definition of a "security" mirrors that of the federal law. 15 U.S.C. § 77b (1988). Section 30–1457 of the Idaho Code gives explicit direction to construe the Idaho Securities Act to "effectuate its general purpose to make uniform the law of those states which enact similar statutes and to coordinate the interpretation and administration of this act with the related federal regulations." I.C. § 30–1457. This leads to an examination of decisions construing like language in the federal securities statutes which define "investment contract."

The federal definition of security "embodies a flexible rather than a static principle." *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). Application of the term "security" turns not on the form of the transaction but on the

despite the possibility of conflicting inferences, because the court alone will be in the position of resolving the conflicting inferences at trial. *Riverside Dev. Co.,* 103 Idaho at 519, 650 P.2d at 661; *Loomis v. City of Hailey,* 119 Idaho 434, 436–37, 807 P.2d 1272, 1274–75 (1991); *Wells v. Williamson,* 118 Idaho 37, 40, 794 P.2d 626, 629 (1990); *Jones v. E.G. & G. Idaho Inc.,* 109 Idaho 400, 401, 707 P.2d 511, 512 (1985); *Argyle v. Slemaker,* 107 Idaho 668, 671, 691 P.2d 1283, 1285 (Ct.App.1984).

2. The parties in this case did not timely request a jury trial. On December 1, 1993, the district court issued its Memorandum Decision in response to RSC's motion for jury trial and reconsideration. The district court determined:

> RSC did not demand a jury trial until almost two years after the last pleading directed to such issue, well beyond the ten day limit [provided in I.R.C.P. 38(b)].
>
> ....
>
> Not only was the motion for jury trial extremely untimely pursuant to Rule 38(b), but defendants' reason for not demanding it is grossly insufficient to allow the motion at such a late date under the "safety valve" exception. Therefore, RSC's motion for jury trial is denied.

economic realities of the underlying transaction. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *see also Howey*, 328 U.S. at 298, 66 S.Ct. at 1102–03; *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352–53, 64 S.Ct. 120, 124–25, 88 L.Ed. 88 (1943).

■ In *Howey*, the U.S. Supreme Court set forth the landmark definition of an "investment contract" as

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

328 U.S. at 298–99, 66 S.Ct. at 1103.

Under *Howey* and its progeny, an "investment contract" is the coalescence of three elements: (1) an investment of money, (2) a common enterprise, and (3) "a reasonable expectation of profits to be derived from the entrepreneurial or management efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). RSC argues that its program does not meet any part of this test.

**B. The First Prong of *Howey*: "Investment of Money"**

■ The first prong of the *Howey* test requires the investment of money. "An 'investment' typically involves parting with money for the purpose and in the reasonable expectation of making a profit." *S.E.C. v. Energy Group of Am., Inc.*, 459 F.Supp. 1234, 1239 (1978). Payment of a fee may be an investment if the customer reasonably anticipates, in light of the scheme in its entirety, a return on his or her payments. *Cellular Eng'g, Ltd. v. O'Neill*, 118 Wash.2d 16, 820 P.2d 941, 948 (1991); *Jones v. International Inventors, Inc. East*, 429 F.Supp. 119, 120–21 (N.D.Ga.1976).

**1. Whether Customers "Reasonably" Believe They are Investing is Determined Objectively.**

The district court originally focused on Holt's subjective understanding of whether she (1) believed she was investing, and (2) reasonably anticipated making a profit. In its Memorandum Decision issued July 24, 1992, the district court stated:

The ultimate determination here seems to hinge upon the reasonableness of Ms. Holt's perception of her participation in RSC's plan as an investment. Thus, if either party had requested a jury in this matter, I would conclude that both motions for summary judgment should be denied. However, because this is a bench trial, you are required to draw factual conclusions, including determinations of reasonableness.

A reasonableness determination should be made regarding Ms. Holt's understanding of RSC's program based upon Ms. Holt's age and education, as well as from her perception of the service after reading the initial advertising materials. Because Ms. Holt appears to be an older woman who lacks any experience in oil and gas drilling or lease development ... and because the advertising material fails to disclose the true nature of the customer's participation in marketing her lease, I would conclude that Ms. Holt's assessments were reasonable.

Later in addressing RSC's motion for jury trial and reconsideration, the district court revised its position regarding resolution of "reasonableness" based on Holt's subjective understanding and characteristics: "[A]s properly pointed out by RSC, the standard of reasonableness in this case turns on the *objective* reasonableness of the investor, not the subjective perceptions of Ms. Holt." However, the district court still concluded, "In light of all the promotional literature, I still feel that a potential client of RSC could reasonably expect a return on their investment."

■ RSC claims that there are factual disputes concerning Holt's understanding of the program, maintaining that she was inconsistent in her testimony on this point. Holt is not a party to this action. She brought the RSC program to the attention of the Department, but the State, acting through the Department, is the party bringing this action. In determining whether a customer's belief is reasonable, the standard must be the reasonable person, not the understanding of a specific individual. Otherwise the untenable re-

sult easily could occur that in two cases litigated by the Department, both with identical facts, the same program could be determined to be a security in one case and not in another. Holt's personal characteristics may be very relevant in a private action for misrepresentation, but the district court's initial reliance upon Holt's subjective perception that RSC was marketing a security was misplaced. Similarly, RSC's claims of a factual dispute are irrelevant because the Court is concerned with the standard of an objectively reasonable person, not the personal understanding of Holt.

### 2. Customers Pay a Fee in Return for RSC's Application Service in the BLM Lottery.

■ RSC claims that Holt did not "invest" because RSC customers do not "contribute capital to any enterprise with the intention of sharing in its profits and earnings resulting from use of their contributions." RSC claims the $40.00 payment is merely a fee paid in exchange for its services of entering RSC customers in a lottery. The economic reality of the program supports RSC's argument that the BLM drawing is a lottery and RSC is paid a fee for a service.

A lottery is a species of gaming, where "prizes are distributed by chance among persons paying a consideration for the chance to win; a game of hazard in which sums are paid for the chance to obtain a larger value in money or articles." *Oneida County Fair Bd. v. Smylie*, 86 Idaho 341, 346, 386 P.2d 374, 376 (1963) (quoting *State v. Village of Garden City*, 74 Idaho 513, 265 P.2d 328 (1953)). The distinction between the BLM lottery and any other lottery is simply that this lottery involves an area of specialized procedure that is not widely known and requires knowledge not possessed by most people. RSC promotes an expertise in the procedure for entering the lottery, but its customers are not buying into RSC and cannot reasonably expect anything but the right to win or lose dependent upon chance. This fact was set forth in the literature RSC provided potential customers. A customer who wins the lottery and obtains a valuable right is not required to share the good fortune with RSC.

RSC lacks a stake in the outcome of the lottery. While this is not determinative as to whether the transaction is an investment, it weighs in favor of finding no investment has been made.

Moreover, the services provided by RSC are less involved than those in *S.E.C. v. Energy Group*, 459 F.Supp. 1234 (S.D.N.Y. 1978), in which the federal district court for the Southern District of New York found that customers paid a fee to participate in a lottery, and did not "invest." The company in *Energy Group* solicited customers through advertising to utilize its services in connection with oil and gas lotteries conducted by the BLM. The district court summarized the facts in *Energy Group* as follows:

> EGA solicits customers, through advertising and direct mailing, to utilize its services in connection with oil and gas lease lotteries conducted by the Department of the Interior, Bureau of Land Management ("BLM").
>
> . . . .
>
> EGA offers the following services to its customers:
>
> 1. A monthly listing of parcels it expects to be subject to BLM public drawing, based on expirations of existing ten-year leases. This is a valuable service, EGA claims, because it gives EGA customers more time to select and enter non-competitive bids on parcels than the normal five days between BLM listing and the entry deadline. If a parcel selected by a customer from EGA's list is not offered by BLM, EGA will substitute a parcel of equivalent value on the customer's application.
>
> 2. EGA claims to possess expertise in selecting parcels on which to bid, and lists in its monthly listing six to ten recommended parcels in each state, an amount that EGA will pay for each lease it recommends should that lease be won, and the expected number of applicants for each lease.
>
> 3. EGA fills out and submits the BLM entry card on behalf of the customer.
>
> 4. If a customer wins a lease, EGA pays the first year's rental, with the understanding (not a legally-enforceable agree-

ment) that it is to be repaid when the customer sells or assigns the lease or when the property produces oil or gas.

5. EGA offers, if the customer requests the service, to notify the winner of any inquiries EGA receives concerning sale of the lease.

6. EGA stands ready to purchase the lease from the winner at the price at which it valued the lease on the monthly listing.

459 F.Supp. at 1236–37.

The reasoning in *Energy Group* that customers made no "investment" is persuasive and applicable here considering the economic reality of the transaction. The promotional literature in *Energy Group*, like RSC's promotional literature, encouraged "readers to participate in a lottery, where the odds are greatly against them, and to utilize [the company's] services ... in so doing." *Id.* at 1239. Similar to RSC's literature, the literature in *Energy Group* "explain[ed] the BLM leasing programs [and] stress[ed] the potential windfall awaiting a winner of a lease." *Id.* at 1237. As the court concluded in *Energy Group*, the company's program involved "no 'plan of distribution' since no capital is placed in the hands of an enterprise with the expectation of a return on investment. A customer pays a [stated] fee, in return for which is received certain services." *Id.* at 1239.

Calling a payment a "fee" does not prevent further consideration as to whether the participant is investing in a security. Calling a program a "lottery" also does not prevent further consideration into whether the program is a security. See, e.g., *Cellular Eng'g, Ltd.*, 820 P.2d at 947. However, in this case, the economic realities of the transaction do not amount to investing. Customers pay a fee to RSC for its service of entering their names in a lottery.

Despite the fact that transactions should be construed flexibly to effectuate the purposes of the Securities Act, the Court declines to stretch the potential applicability of the Act to transactions not contemplated by the legislature. *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103 (whether statutes are to apply

to a transaction is tested not by the desirability of the regulation but by whether such application will fulfill the statutory purpose of "compelling full and fair disclosure relative to the issuance of 'many types of instruments that in our commercial would fall within the ordinary concept of a security'"). Our law has other remedies that do not warp the definition of a security that can be utilized if promotions are misleading, such as an action for common law fraud or proceedings under the Consumer Protection Act. I.C. §§ 48–601 to 617.

The district court erred in determining that RSC's program constituted marketing a security. This case is resolved by holding RSC's program fails the first prong of *Howey*. It is not necessary to reach whether RSC's program meets the requirements of the remaining two prongs nor RSC's "vagueness" argument. The district court's decisions holding RSC violated the Act and extending personal liability for those violations to Engle are reversed.

## VI.

### CONCLUSION

The decision of the district court on summary judgment that RSC was marketing a security is reversed. Costs are awarded to Resource Service Company. No attorney fees are allowed.

TROUT, C.J., and JOHNSON, McDEVITT * and SILAK, JJ., concur.

* Justice McDevitt participated in this decision prior to his resignation.