**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOUIS F. ALLEN; CARL K. BAKER;
JOYCE P. BAKER; PETER D.
BERRINGTON; OLIVER BIRCKHEAD;
FLORENCE BLAUSTEIN; MARY L.
BRAY; T. K. BROOKER; DONALD J.
BROOKS; JOSEPH CALLAGHAN; JAMES
CASSEL; TERRY G. CHAPMAN; J. A.
CLAWSON; JOHN K. COLVIN; FRED B.
COX; JOHN RAWLYN CHARLES
CRABTREE; CHRISTOPHER P. CLUP;
GORDON C. DAVIDSON; RUTHERFORD
DAY; DONALD D. DOTY; M. D. A.
EMBLIN; AUDREY FISHER; DONALD B.
GIMBEL; KENNETH J. GIMBEL;
KATHERINE GOOCH; B. G. HARRISON;                   No. 96-2158
YUMIKO HONDA; HERBERT W.
HOOVER, III; MARGARET W. JONES;
DONALD K. KENT; E. R.
KINNEBREW, III; WALTER J. LEVY;
ROLAND LEY; SUZANNE RHULEN
LOUGHLIN; GEORGE C. LYMAN, JR.;
CHARLES P. LYON; MICHAEL L.
MCDERMOTT; ROBERT T. MCINERNY;
ARTHUR G. MICHELS; WALTER P.
MUSKAT; WALTER W. MUSKAT; A. D.
PISTILLI; ROBERT A. POSNER;
JUDSON P. REIS; HARRY W. RHULEN;
WALTER A. RHULEN; J. O. RICKE;
E. JOY ROSE;

MARK S. ROSE; A. F. SMITH; OWN B. TABOR; ALLEN M. TAYLOR; TRUDE C. TAYLOR; KARL ARONSON; JOAN R. FARROWAND JONATHAN M. FARROWFOR THE ESTATE OF JESSE M. FARROW; JACK FLECK; MARILYN FRANCKX; ISABEL L. GALLAGHER; JENNIFER A. GALLAGHER; MARY CLAIR GALLAGHER; ROBERT E. GALLAGHER; ROBERT E. GALLAGHER, JR.; THOMAS J. GALLAGHER; THOMAS H. GREEN; HENRY G. HAGER; THORNTON HUTCHINS; VINCE A. KONEN; C. C. LUCAS; HERBERT A. MIDDENDORFF; ROBERT S. DENEBEIM; DANA FISHER, SR.; WILLIAM ALEXANDER FLORENCE; ANNE M. GALLAGHER; J. PATRICK GALLAGHER; MARK E. GALLAGHER; MARY CLAIRE GALLAGHER AS EXECUTRIX FOR JOHN P. GALLAGHER; KATHERINE GALLAGHER GOESE; ALLEN S. GREEN; ROBERT W. HATCH; MARY CLAIR G. JOHNSON; THOMAS V. LEEDS; GUY A. MAIN; EUGENE F. MIDDLEKAMP; MICHAEL MONTANA; BARBARA H. PISANI; RICHARD B. SANDERS; JACK R. TAYLOR; KEN NOACK; ROBERT L. PISANI; LARRY D. STROUP; NEVILLE G. WILLIAMS, Plaintiffs-Appellees,

v.

2

LLOYD'S OF LONDON, an
unincorporated association;
CORPORATION OF LLOYD'S, a/k/a
Society and Council of Lloyd's;
COUNCIL OF LLOYD'S,
Defendants-Appellants,

and

EQUITAS HOLDINGS LIMITED; EQUITAS
REINSURANCE LIMITED; EQUITAS
LIMITED, a/k/a Equitas or Equitas
Group,
Defendants.

ASSOCIATION OF LLOYD'S MEMBERS;
GOVERNMENT OF THE UNITED KINGDOM
OF GREAT BRITAIN AND NORTHERN
IRELAND; NATIONAL ASSOCIATION OF
INSURANCE BROKERS; CALIFORNIA
INSURANCE COMMISSIONER,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-96-522)

Argued: August 27, 1996

Decided: September 3, 1996

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Michael and Judge Motz joined.

_____

3

**COUNSEL**

**ARGUED:** Harvey L. Pitt, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for Appellants. Alexander Stephens Clay, IV, KILPATRICK & CODY, Atlanta, Georgia, for Appellees. **ON PLEADINGS:** Michael H. Rauch, Bonnie Steingart, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York; Cynthia T. Andreason, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P., Washington, D.C.; Henry H. McVey, Warren E. Zirkle, Darryl S. Lew, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellants. Richard R. Cheatham, Susan A. Cahoon, Stephen E. Hudson, Christopher B. Lyman, KILPATRICK & CODY, Atlanta, Georgia; Conrad M. Shumadine, Walter D. Kelley, Jr., WILLCOX & SAVAGE, Norfolk, Virginia, for Appellees. Timothy M. Kaine, Rhonda M. Harmon, MEZZULLO & MCCANDLISH, Richmond, Virginia, for Amicus Curiae Association of Lloyd's Members. Mark R. Joelson, Joseph P. Griffin, Thomas J. O'Brien, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Amicus Curiae United Kingdom. Ronald A. Jacks, David M. Spector, MAYER, BROWN & PLATT, Chicago, Illinois, for Amicus Curiae NAIB; Martin Shulman, Paul H. Falon, MANATT, PHELPS & PHILLIPS, L.L.P., Washington, D.C.; Richard A. Brown, Leonard D. Venger, Donald R. Brown, MANATT, PHELPS & PHILLIPS, L.L.P., Los Angeles, California; William W. Palmer, General Counsel, CALIFORNIA DEPARTMENT OF INSURANCE, San Francisco, California, for Amicus Curiae Insurance Commissioners.

_____

**OPINION**

NIEMEYER, Circuit Judge:

In 1995, Lloyd's of London announced a $22 billion "Plan for Reconstruction and Renewal" to restructure the Lloyd's market's reinsurance needs and to revitalize the market. The Plan included an offer by Lloyd's managers to settle, for $4.8 billion, all intra-market disputes, including existing and potential lawsuits by "Names," members of the Lloyd's market who underwrite insurance there. Ninety-

4

three American Names filed this action in the Eastern District of Virginia under United States securities laws to compel Lloyd's to disclose more financial information about its proposed plan. The Names also sought a preliminary injunction prohibiting Lloyd's from forcing American Names to make "an irrevocable election respecting their investment" by an August 28, 1996 deadline established by Lloyd's.

Applying United States securities laws, the district court granted the Names' motion for a preliminary injunction on August 23, 1996. The court directed Lloyd's to make disclosures as required by § 14(a) of the Securities Exchange Act of 1934 by September 23, 1996, and prohibited Lloyd's from taking steps to collect any amounts from American Names pending completion of the disclosure and review process. The court also scheduled a trial on the merits for November 4, 1996.

Lloyd's appealed the district court's preliminary injunction and sought expedited review because Names wishing to accept the settlement proposal that Lloyd's offered as part of its Plan were required to advise Lloyd's of their decision by noon on August 28, 1996. We scheduled oral argument for August 27, 1996, and, following argument, entered the following order from the bench, reversing the district court:

> On the motion of appellants to stay the district court's injunction entered August 23, 1996, and upon consideration of the briefs, papers, and extensive arguments of counsel, the court grants the motion. Because the court's decision rests on its determination, to be articulated in a later opinion, that the contractual provisions among the parties selecting the law of and a forum in the United Kingdom should be enforced, we reverse and remand this case with instructions that the district court dismiss it.

This opinion provides the reasoning for our order.

I

Lloyd's of London manages an insurance market that was created over 300 years ago in a London coffee shop to insure shipping risks.

5

The market today is a large, complex arrangement under which "Names," who as members of the Society of Lloyd's become members in the market, join individual underwriting syndicates formed to insure a broad range of risks. Managing agents assemble the syndicates, collect premiums from the insureds, assess the Names, manage the risks, and provide annual accountings to the Names. The underwriting capital for each syndicate is supplied by cash advanced by the Names, and excess losses -- those that exceed the premiums paid -- are insured by the Names' commitment to pay losses from their personal assets "down to their last cufflinks." The integrity of the market is also assured by a Central Fund, created from assessments of Names, which the market's managing body, the Council of Lloyd's, controls and maintains to disburse to insureds when Names default.

The Lloyd's market is governed by a series of acts of Parliament, enacted over the last 100 years, authorizing the Council of Lloyd's to adopt rules and bylaws to regulate the market. As a condition of their membership in the Society, Names are required to execute a "General Undertaking," by which they agree to comply with the controlling acts of Parliament as well as the rules and bylaws of Lloyd's.

Over 34,000 Names from 80 different countries participate in the Lloyd's market; 3,000 Names are Americans. While individuals are solicited in countries other than the United Kingdom, each prospective Name is required to travel to London to participate in a personal interview during which the Name's financial commitment is explained. Names are advised that they undertake unlimited personal liability for their respective shares of the risks insured by the policies they underwrite and that they cannot resign from the market until all such obligations have been discharged. They are also advised that any disputes over their participation in the market must be resolved in British courts according to British law.

The Lloyd's market operates under a three year accounting cycle. At the end of the third year after a syndicate is formed, underwriting profits and losses for each syndicate year are calculated, and the estimated liabilities are routinely reinsured by another syndicate. Through this process, Lloyd's reinsures undischarged risks to close the account. When the magnitude of potential liabilities for a syndicate cannot reasonably be estimated at the end of three years, the syn-

6

dicate cannot reinsure them, and the participating Names remain liable on their undertaking.

During the late 1980's and early 1990's, unanticipated losses from asbestosis and pollution claims, together with a string of catastrophic events such as Hurricane Hugo and the bombing of Pan Am Flight 103, caused losses far greater than the amounts of premiums that had been collected. By Lloyd's estimation, the excess losses for the years before 1993 will total approximately $22 billion.

As losses mounted, intra-market disputes arose. Names accused managing agents and underwriters of mismanagement in assessing risks and even fraud in assessing and disclosing the risks to Names choosing syndicates. A considerable number of Names also became unable or unwilling to satisfy their obligations and began to incur debts to the Central Fund, and the ensuing litigation made it difficult for the Central Fund to collect from non-paying Names. The integrity and viability of the entire Lloyd's market was thus called into doubt.

To restore the integrity of its market, Lloyd's embarked on a massive and complex effort to develop a restructuring plan. After three years and the expenditure of over $100 million, Lloyd's issued a Plan for Reconstruction and Renewal with two gross components: (1) the settlement of intra-market litigation whereby Names release all claims against Lloyd's and its various market participants in exchange for $4.8 billion in credits and (2) the reinsurance of Names' pre-1993 underwriting obligations by a newly formed company, Equitas Reinsurance Ltd. Under the Plan, Equitas' capital is to be funded by loans, a cash call on Names, and the $4.8 billion in credits assembled by Lloyd's for the settlement of the Names' claims.

Lloyd's circulated its Plan and offered each Name the opportunity to settle with Lloyd's for a specified share of the settlement funds. The Plan provides that if enough Names agree to settle, those Names who do not agree will nevertheless be forced to contribute capital to Equitas through assessments authorized by their original commitment to Lloyd's. Under the Plan, any capital that remains after Equitas has satisfied all outstanding pre-1993 obligations will be returned to the Names. Lloyd's offered its settlement with Names subject to the condition that Names respond by August 28, 1996, a deadline that

7

Lloyd's claims was necessary because the continued solvency of its market is in jeopardy and the season for underwriting reinsurance traditionally begins in the fall.

The 93 American Names who have demanded more information about the Plan filed suit in the Virginia district court, claiming that Lloyd's was denying them disclosure rights guaranteed by United States securities laws. Lloyd's moved to dismiss the complaint on the ground that the Names had agreed to litigate all disputes relating to the Lloyd's market in the United Kingdom under British law. The district court denied Lloyd's motion. Applying United States securities laws, the court also enjoined Lloyd's from demanding settlement from the American Names without providing the disclosures required by the securities laws and ordered that Lloyd's provide such disclosures within 30 days. This appeal followed.

II

In reversing the district court by our August 27, 1996 order, we determined that "the contractual provisions among the parties selecting the law of and a forum in the United Kingdom should be enforced." Those contractual provisions, which appear in the General Undertaking between Lloyd's and the Names, specify that "any dispute and/or controversy of whatsoever nature arising out of or relating to" Names' participation in Lloyd's be submitted to the exclusive jurisdiction of the British courts and that British law govern all matters referred to in the General Undertaking, including the parties' "rights and obligations . . . arising out of or relating to" the Names' participation in Lloyd's.

Since its seminal decision in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972), the Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity, rejecting the "parochial concept" that "notwithstanding solemn contracts . . . all disputes must be resolved under our laws and in our courts." Id. at 9; see also Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, 115 S. Ct. 2322, 2329 (1995); Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985); Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974). But the presumption of en-

8

forceability that forum selection and choice of law provisions enjoy is not absolute and, therefore, may be overcome by a clear showing that they are " `unreasonable' under the circumstances." The Bremen, 407 U.S. at 10. Choice of forum and law provisions may be found unreasonable if (1) their formation was induced by fraud or over-reaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state. See Carnival Cruise Lines, 499 U.S. at 595; The Bremen, 407 U.S. at 12-13, 15, 18.

In determining whether any of the foregoing circumstances apply in this case to preclude enforcement of the parties' choice of forum and law, the district court first observed that"there is no contention by the Names that they were fraudulently induced into agreeing to the forum selection or choice of law clauses." Nor did the court believe it " `gravely inconvenient' for the Names to litigate in England." Noting that "United States courts have consistently found English tribunals to be neutral and just," the district court further found that the "plaintiffs would not be effectively `denied their day in court' were they forced to present their claims in front of an English tribunal." But applying the last basis for unreasonableness, the court denied enforcement to the parties' choice of forum and law provisions on the ground that they subverted a strong public policy of the United States-- namely, the unwaivable investor protections provided by the American securities laws' disclosure requirements.

Although we agree with the district court that the first three bases for finding unreasonableness do not apply here, we disagree with its conclusion that the public policy underlying the United States securities laws justify denying enforcement of the parties' choice of forum and law clauses.

III

By adopting a policy of full disclosure of relevant information to replace the doctrine of caveat emptor, the United States securities laws play a critical role in sustaining honest and efficient domestic

9

capital markets. See, e.g., SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-87 (1963). Indeed, the United States securities laws prohibit attempts to waive their disclosure requirements. See 15 U.S.C. §§ 77n, 78cc(a). But the question remains in this case whether the choice of forum and law clauses to which the Names agreed when entering the Lloyd's insurance market implicate the anti-fraud and disclosure policies that underlie the United States securities laws to the extent that those clauses cannot be enforced.

We do not believe that enforcing the parties' forum selection and choice of law provisions in this case will subvert the United States securities laws' policy of prohibiting fraud. British law not only prohibits fraud and misrepresentations as do the United States securities laws, but also affords Names adequate remedies in the United Kingdom. See Shell v. R.W. Sturge Ltd., 55 F.3d 1227, 1231 (6th Cir. 1995); Bonny v. Society of Lloyd's, 3 F.3d 156, 161 (7th Cir. 1993), cert. denied, 510 U.S. 1113 (1994); Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1365 (2d Cir.), cert. denied, 510 U.S. 945 (1993); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir.), cert. denied, 506 U.S. 1021 (1992). Under British law, the Names could bring claims based on the tort of deceit, breach of contract, negligence, and breach of fiduciary duty, and could obtain injunctive, declaratory, rescissionary, and restitutionary relief. See Shell, 55 F.3d at 1230-31. And "[t]he fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement." Riley, 969 F.2d at 958.

Moreover, we do not believe that Congress intended that the disclosure requirements of the United States securities law be exported and imposed as governing principles on markets conducted entirely in other countries simply because membership in such markets is solicited in the United States. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1334 (2d Cir. 1972) (finding language of Securities Exchange Act "too inconclusive" to find that "Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security"). "[C]onfronted with [a] transaction that on any view [is] predominantly foreign, [we] must seek to determine whether Congress would have wished the precious resources of United States

10

courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.), cert. denied, 423 U.S. 1018 (1975).

For over 300 years, Lloyd's has been regulating an insurance market in London where members underwrite risks which are pooled into syndicates and managed by agents. While Lloyd's offers membership in the market to persons outside the United Kingdom, including Americans, syndicates are formed and managed at the market. When an individual from a country other than the United Kingdom is solicited for membership, market rules require that he travel to London for a personal interview. The would-be Name is provided with written materials advising him that he will be joining underwriting syndicates formed in London to insure risks from around the world under laws adopted by Parliament and bylaws promulgated by Lloyd's regulators. Prospective Names are also informed of the commitment of membership, which requires that Names have sufficient means committed to the market in London.

Relieving Names of their agreements is not justified in these circumstances simply because solicitation for membership in the market occurs in the United States. Membership solicitation is incidental to the formation of underwriting syndicates and the management of risks, all of which occur in London. Moreover, when members are solicited for membership, they are not solicited to join particular syndicates or to underwrite identified risks. Those matters are unknown until syndicates are actually created at the market. The United States nexus to the transactions involved in this case is thus incidental and tangential.

Although American courts have on occasion applied United States securities laws' anti-fraud provisions to predominantly foreign transactions, the "anti-fraud provisions of American securities laws have broader extraterritorial reach than American filing requirements." Consolidated Gold Fields PLC v. Minorco S.A., 871 F.2d 252, 262 (2d Cir. 1989). This is because "an interest in punishing fraudulent or manipulative conduct is entitled to greater weight than are routine administrative requirements." Restatement (Third) of the Foreign Relations Law of the United States § 416 cmt. a (1986).

11

To permit the Names to escape their agreements to be bound by the laws and rules of the British market just at a time when they face losses would also violate the most fundamental precepts of international comity. See Consolidated Gold Fields, 871 F.2d at 263 ("[A] court may abstain from exercising enforcement jurisdiction when the extraterritorial effect of a particular remedy is so disproportionate to harm within the United States as to offend principles of comity"). Imposing United States securities laws on this foreign market would directly contravene the very rules and regulations adopted in Britain for the creation and operation of the Lloyd's market to which the Names subscribed.

Finally, significant United States and foreign interests would be adversely affected if we were to insist that Lloyd's insurance underwriting syndicates comply with United States disclosure requirements. Such a ruling would place at risk billions of dollars of insurance coverage for United States citizens because American Names could demand rescission on the ground that their syndicates, even though they include citizens of various countries, did not comply with United States securities registration and disclosure requirements. Insurance commissioners from several states have described the potential mass confusion and damage to the domestic insurance market that such a ruling would cause.

In short, we conclude that enforcement of the Names' agreements to litigate disputes in the United Kingdom under British law does not contravene or undermine any policy of the United States securities laws. And we reach that same conclusion when we apply the specific provisions of the securities laws, to which we now turn.

IV

The Names advance two arguments to support their assertion that United States securities laws apply to the Lloyd's Reconstruction and Renewal Plan. First, they argue that the interests in Equitas offered by Lloyd's as part of the Plan are "investment contracts," subject to the disclosure and anti-fraud requirements of the 1933 and 1934 Acts. And second, they argue that their investments in Lloyd's pursuant to the General Undertaking are equity securities under the applicable securities acts and that the Plan is, therefore, a solicitation for "con-

12

sent or authorization in respect of [a] security," subject to the requirements of § 14(a) of the 1934 Act, 15 U.S.C.§ 78n(a).

To determine whether Lloyd's Plan constitutes an"investment contract" subject to the requirements of the securities laws, we apply the test announced in SEC v. W.J. Howey Co., 328 U.S. 293 (1946). In Howey, the Supreme Court established that "an investment contract . . . means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of [others]." Id. at 298-99. And the Court later instructed that the Howey test is to be applied with an eye to "the substance -- the economic realities of the transaction -- rather than the names that may have been employed by the parties." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 851-52 (1975).

Focusing on the substance of the Plan before us, we discern two components: the settlement offer and the reinsurance through Equitas. The settlement component satisfies none of the Howey factors and, therefore, cannot make the Plan a security. And, whatever else might be said about the Equitas component, it does not satisfy the third Howey factor; none of the Names can expect to receive profits from their participation in Equitas. Indeed, the Plan creates Equitas solely to reinsure and discharge Names' preexisting obligations, not to underwrite new risks for profit. While Names may receive rebates should Equitas' initial capitalization ultimately prove greater than needed to discharge the Names' outstanding liabilities, such rebates are not profits, but rather a return of capital. See Forman, 421 U.S. at 854. Furthermore, Equitas is forbidden by its Articles of Association from paying dividends, and Lloyd's has indicated that, in the unlikely event that it generates profits by investing Equitas' capital during its operation, Lloyd's would donate such profits to charity. Because Lloyd's is not "induc[ing] purchases [in Equitas] by emphasizing the possibility of profits" or offering"profits [from Equitas] . . . in the form of capital appreciation or participation in earnings," Teague v. Bakker, 35 F.3d 978, 987 (4th Cir. 1994), cert. denied, 115 S. Ct. 1107 (1995), we readily conclude that no part of the Plan qualifies as a security for purposes of the securities laws.

We are similarly unpersuaded by the Names' second argument -- that their initial investment in Lloyd's pursuant to the General Under-

13

taking is a security and that the Plan is, therefore, a solicitation for "consent or authorization in respect of [a] security" subject to § 14(a) of the 1934 Act. Section 14(a) makes it "unlawful for any person, by the use of . . . any means or instrumentality of interstate commerce . . . to solicit . . . any proxy or consent or authorization in respect of any [registered] security" in contravention of the rules and regulations prescribed by the Securities Exchange Commission. 15 U.S.C. § 78n(a). Although the parties vigorously dispute whether the Names' initial investment in Lloyd's qualifies as an "equity security" within the meaning of the Act, we need not resolve that issue because the Plan does not "solicit . . . any proxy or consent or authorization."

Section 14(a) embodies a policy of broad disclosure designed to protect the basic right of corporate suffrage. See J.I. Case Co. v. Borak, 377 U.S. 426, 431-32 (1964); see also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 381 (1970); H.R. Rep. No. 1383, 73d Cong., 2d Sess., at 13 (1934) ("Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange"). But not every communication from management to corporate shareholders amounts to solicitation under§ 14(a). Sargent v. Genesco, 492 F.2d 750, 767 (5th Cir. 1974); see also Brown v. Chicago, Rock Island & Pacific R.R., 328 F.2d 122, 125 (7th Cir. 1964); see generally 4 Louis Loss & Joel Seligman, Securities Regulation 1952 (3d ed. 1990) (listing examples of communications not covered by § 14(a) rules). Rather, it is only when management seeks consent or authorization for actions "requiring such approval" that § 14(a) steps in to ensure that approval is given with full knowledge. Gaines v. Haughton, 645 F.2d 761, 775 (9th Cir. 1981), cert. denied, 454 U.S. 1154 (1982); see also Ash v. GAF Corp., 723 F.2d 1090, 1094 (3d Cir. 1983) (holding that "complainant must show that he suffered harm from the infringement of his corporate suffrage rights" to state a claim under § 14(a)); cf. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (indicating that securities laws require accurate disclosure only of facts that would have assumed actual significance in a reasonable investor's decisionmaking).

Neither British law nor the General Undertaking signed by each Name grants Names any role in the decision to form and capitalize Equitas. Authorization to impose reinsurance through Equitas on the Names does not derive from their consent, but by virtue of a Lloyd's

14

bylaw passed in December 1995. Thus, the Plan is not a solicitation within the meaning of § 14(a).

Similarly, Lloyd's settlement offer is not subject to the disclosure requirements of § 14(a). The offer of settlement presents each Name with the choice of whether to waive his claim against Lloyd's and its agents in exchange for Lloyd's partial funding of his share of the Equitas premium. The Names have not presented, and we have been unable to find, any authority indicating that settlement offers in securities cases seek "consent or authorization in respect of [a] security," and we cannot conclude that Congress intended to bring all such communications within the purview of the securities laws.

V

In summary, the policies of the United States securities laws do not override the parties' choice of forum and law for resolving disputes in this case. Indeed, because Lloyd's Plan for Reconstruction and Renewal is neither a security nor a solicitation in respect of a security, the Plan is not regulated by the United States securities laws. For these reasons we vacated the district court's August 23, 1996 order by our August 27, 1996 order and remanded this case with instructions to the district court to dismiss the action.

REVERSED AND REMANDED WITH INSTRUCTIONS

15