Vincent ALBANESE, et al., Plaintiffs,

Donald M. Arthur, Kenneth L. Bell, Gilbert Clark, Robert D. Copenhaver, Jr., R.E. Evans, Paul Fogel, Millard Gamble, III, Millard G. Gamble, IV, Henry P. Glindeman, Jr., Herbert Green, Joseph Insoft, R. Hank Jennings, Thomas K. McKenzie, Ronald H. Miller, David S. Mitchell, James Pascia, Donald Roderick, Wayne Schmidt, Phillip Schwartz, Barry Robert Weiss, David D. Whitaker, Plaintiffs-Appellants,

v.

**FLORIDA NATIONAL BANK OF ORLANDO, Defendant-Appellee.**

No. 86–3776.

United States Court of Appeals, Eleventh Circuit.

July 30, 1987.

Frances Makemie Toole, John R. Bush, Bush, Ross, Gardner, Warren & Rudy, Tampa, Fla., for plaintiffs-appellants.

William G. Cooper, Coker, Myers & Schickel, Jacksonville, Fla., for defendant-appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

In this case, we once again scrutinize a series of contracts to determine whether they are securities within the meaning of the Securities Exchange Act of 1934. The United States District Court for the Middle District of Florida determined that the contracts are not securities and, deciding that it therefore lacked subject matter jurisdiction, granted summary judgment to defendant. We disagree and reverse that judgment.

Plaintiffs in this case are investors who purchased ice machines from Polar Chips

International, Inc. ("PCI"). Under various contracts, PCI either agreed to manage or to lease back the ice machines from the investors and to place them in various hotels, motels, and other institutions. PCI was to contract with those institutions for placement of the ice machines, to service the machines, and to collect the money from each machine for the investor who owned that machine.

Unfortunately, although some machines were placed at hotels or motels, most of the machines sold simply did not exist. PCI was, in fact, engaged in a scheme whereby it sold non-existent machines to new purchasers and used the proceeds to pay earlier investors. Plaintiffs discovered the scheme and brought suit against the Florida National Bank of Orlando ("FNBO"), alleging that the bank aided and abetted PCI in violating sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b), and Rule 10(b)5 thereunder, 17 C.F.R. sec. 240.10b–5.

After extensive discovery, FNBO filed a motion for summary judgment, claiming that the pertinent contracts were not securities and that the court therefore did not have subject matter jurisdiction. The district court agreed and granted summary judgment to defendant. Plaintiffs appealed to this court.

Any analysis of an investment contract as a security must begin with *Securities Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In that case, the Supreme Court established a security as consisting of three elements: (1) an investment of money; (2) a common enterprise; and (3) leading the investor to expect profits solely from the efforts of a third party. *Id.* at

298–99, 66 S.Ct. at 1103. In this case, the district court found that the contracts satisfied the first two parts of the *Howey* test, but that, because plaintiffs retained the potential for ultimate control over their investments, their expectation of profits was not based on the efforts of third parties.

█ This third part of the *Howey* test, as might be expected, has proved to be the most litigated of the three elements. Under the precedent of this circuit, the crucial inquiry is the amount of control that the investors retain under their written agreements.[1] *Williamson v. Tucker,* 645 F.2d 404, 423–24 (5th Cir.1981).[2] If the investor retains the ability to control the profitability of his investment, the agreement is no security. *Gordon v. Terry,* 684 F.2d 736 (11th Cir.1982). Thus, the first step in analyzing investment contracts is to look to the contracts themselves.

This task is made somewhat complicated in this case by the fact that there are three separate agreements involved. All plaintiffs signed either a Management Agreement, a Lease Agreement, or an Equipment Lease with PCI. Under the Management Agreement, PCI agreed to manage the machines that plaintiffs bought from PCI. PCI provided machine locations; but the investors had the right to reject these locations and to specify others; and the parties had to agree on the removal and relocation of the machines. PCI was responsible for servicing the machines and collecting the proceeds and was required to render a monthly and annual accounting of the collections and expenses. The Management Agreement was for a period of forty-seven (47) months, but was terminable before that time upon mutual agreement.

1. The precedent of this circuit is ambiguous regarding the degree of control that a contract may grant an investor and still be considered a security. *See, e.g., Securities and Exchange Comm. v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 480 (5th Cir.1974) (third prong of *Howey* requiring profits "solely" from efforts of others not to be construed literally); *Villeneuve v. Advanced Business Concepts,* 698 F.2d 1121 (11th Cir.1983) (finding *Koscot* to be inconsistent with *Howey*), *on reh'g,* 730 F.2d 1403, 1404 n. 2 (11th Cir.1984) (en banc) (declining to reach the is-

sue). We need not decide in this case what the appropriate test is, because even applying *Howey* literally, we find that the investors expected profits arising "solely" from the efforts of others.

2. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

The Management Agreement was also terminable unilaterally by the investor if the manager breached the agreement or within ninety days after the investor had repaid the purchase loan to PCI.

Under the Lease Agreement, PCI leased back the machines that it had sold to the investors. Once again, PCI provided machine locations, but the investors had to agree on removal and relocation of the machines. PCI was responsible for servicing the machines and collecting the proceeds and was obligated to provide monthly and annual accountings. The Lease Agreement was terminable upon the same terms as the Management Agreement.

The Equipment Lease also allowed PCI to lease back the machines that it had sold to the investors. PCI provided the machine locations and had the right to move the machines, provided that it notified the owner in writing. The first year, the investor provided a service contract for warranty work, but PCI was responsible for non-warranty maintenance during that time and for all service after the first year. The agreement terminated at the end of forty-seven (47) months or was terminable by the investor if PCI defaulted.

Of these three agreements, it is clear that the Equipment Lease allowed the investor no significant degree of control. Although the owner of the machines had

the right to inspect the machines, he or she did not have the right to control machine placement or the manner in which the proceeds were collected. In fact, the Equipment Lease contained a provision in which the investor agreed that

> so long as LESSEE [PCI] is not in default hereunder, LESSOR [the investor] shall do nothing to disturb the LESSEE'S full right of possession and enjoyment thereof and the exercise of all the LESSEE'S rights with respect thereto during the term of this Lease as provided herein.

Thus, any control that the investor retained was, as a matter of law, insufficient to disqualify this agreement as a security.[3] The district court erred, therefore, by granting summary judgment to the defendant against those plaintiffs who signed Equipment Leases.

The other two agreements are more complicated. The Management Agreement and Lease Agreement both stated that PCI would arrange for the locations for the ice machines, but that the machines would be relocated only upon the consent of both parties. Under the Management Agreement, the investor retained the right to specify the initial placement of each ice machine which he or she owned. Largely on the basis of these facts,[4] the district

---

3. The Equipment Lease, like the other agreements, terminated at the end of forty-seven (47) months, at which time the investors, as sole owners of the ice machines, could have controlled them with no further involvement by PCI. The Lease Agreement and Management Agreement also provided for cancellation of the agreements once the investors had paid PCI for the machines. These provisions are not dispositive. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial ... whether there is a sale of property with or without intrinsic value." *S.E.C. v. W.J. Howey*, 328 U.S. at 301, 66 S.Ct. at 1104.

4. The district court also noted that the investors had the opportunity to inspect PCI's records, and that PCI was obligated to give periodic accountings of the income generated from and expenses of operating each ice machine. This right to inspect was not accompanied by any right to control the operation or service of the ice machines. If the accounting process is rele-

vant at all in this case, it is relevant to whether the agreements contemplated a common enterprise, not to whether the investors retained control over their investments. The district court held that the agreements did contemplate a common enterprise, and we find no error in that analysis.

The district court also found that the investors retained control over their investments because they were able to buy the ice machines without entering into any agreement whatsoever, and that those who did sign agreements were free to negotiate other terms. One investor, for example, specified that his ice machines would be placed only within Florida. Once again, these facts, though important, are not dispositive. The fact that PCI ostensibly offered to sell ice machines without accompanying contracts does not change the essential character of those transactions involving the accompanying contracts. *See, W.J. Howey*, 328 U.S. at 300–01, 66 S.Ct. at 1104.

court determined that the investors retained control over their investments.

■ We find two problems with the district court's analysis. First, the investors' power to specify locations was in reality limited to places that PCI had available. According to the record, it was PCI who contacted the owners of the various institutions and arranged for placement of the ice machines. The investors could not specify just any location for their machines; they had to choose from the sites already procured by PCI. Investors could request a location not on PCI's list, but even then the investors were dependent upon PCI's expertise and labor in arranging the placement.

Second, PCI offered much more than placement of the ice machines. PCI offered its expertise in finding the locations, contracting with the hotels and other institutions, servicing the machines, and accounting for the profits. The fact that the investors could enforce a preference as to the location of their ice machines did not give them any control over the other aspects of PCI's management. Any control, therefore, that the investors retained under their agreements was too insubstantial to disqualify the agreements as securities.

■ Even if the agreements' words did grant the investors sufficient potential control over their ice machines to prevent the agreements from being securities, the record demonstrates that, in fact, any such control was illusory because plaintiffs had no realistic alternative to allowing PCI to manage their investments. *See Gordon,* 684 F.2d at 741; *Williamson,* 645 F.2d at 419–24.

There is no evidence in the record that there were other companies which plaintiffs could hire to manage their ice machines. The only reference in the record to another such company is Jeffries Cabinets, which one of the plaintiffs mentioned in a deposition. Even that company, according to the deposition, was only a service company and did not offer the wide range of management services that PCI offered.

The district court noted that PCI itself contracted with other companies to service machines and to collect revenues. The record demonstrates, however, that plaintiffs did not rely upon PCI actually to service the machines or to collect the proceeds. Rather, plaintiffs relied upon PCI's *management* of the ice machines. That management involved all of the components of directing the enterprise, whether it be placing the machines or repairing and maintaining them.

Although plaintiffs might in a technical sense have been able to contract with the same companies with whom PCI contracted for services, there is no indication that this was a realistic alternative. Even though some plaintiffs were experienced businessmen, none of them had any experience in placing, managing, or servicing ice machines. *Cf., W.J. Howey Co.,* 328 U.S. at 295, 66 S.Ct. at 1101. In fact, the lease and management agreements both stated that the investor is "not familiar with the commercial ice vending machine business, and as an inducement to [Investor] to enter into said Agreement of Sale, [PCI] has agreed to secure on behalf of [Investor] appropriate locations for the placement of said machines and has further agreed to manage and maintain said machines...."

Given the insubstantial, illusory control offered the investors by the contracts in this case, and the lack of reasonable alternatives to reliance upon PCI, we find that the third element of the *Howey* test has been satisfied. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.