*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LA DEVELOPERS, LLC, and DAVID BYKER,

Petitioners-Appellees,

v

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS—CORPORATIONS,
SECURITIES, AND COMMERCIAL LICENSING
BUREAU,

Respondent-Appellant.

FOR PUBLICATION
May 18, 2023
9:15 a.m.

No. 358656
Kent Circuit Court
LC No. 20-002976-AA

Before: SHAPIRO, P.J., and LETICA and FEENEY, JJ.

FEENEY, J.

Petitioners LA Developers, LLC, and David Byker issued promissory notes to repurchase investors' interests in petitioners' condominium development when the project was not progressing as planned. After petitioners failed to make payments on the promissory notes, an investor filed a complaint with respondent Department of Licensing and Regulatory Affairs Corporations, Securities and Commercial Licensing Bureau. The Bureau concluded that the purchase constituted a transfer of a security and, because petitioners omitted a material fact relevant to the purchase, it violated the Michigan Uniform Securities Act ("the Securities Act").[1] Petitioners asserted that the financial instrument in question was not a security as defined by MCL 451.2102c(c). In its ruling, the Bureau adopted the multi-factor test known as the "family resemblance test" established in *Reves v Ernst & Young*[2] as the standard for determining whether an instrument is a security. The circuit court reversed, however, holding that the *Reves* test conflicted with existing Michigan law and the instrument at issue was not a security. The Bureau appeals. The question posed in this case is whether the family resemblance test announced in *Reves* is the appropriate test to apply in Michigan when determining whether a promissory note is a

---

[1] MCL 451.2101 *et seq.*

[2] 494 US 56, 66-67; 110 S Ct 945; 108 L Ed 2d 47 (1990).

security pursuant to the Securities Act. We conclude that *Reves* is the appropriate test and, therefore, we reverse and remand.

## THE UNDERLYING TRANSACTIONS

David Byker owned LA Developers and through it sought $6 million in capital from investors who would participate in a condominium development in Costa Rica through an entity known as Project 5 CR, LLC (Project 5). LA Developers would be the initial member for Project 5 and would serve as the project manager for the investors.

Byker sent a prospectus to potential investors, and he successfully sold the membership interests in Project 5 for $6 million. among the investors were Peggy and Edward Myaard. Peggy testified that she was a Certified Public Accountant. She worked part-time for Byker and Associates from 1995 through 2013 or 2014. She performed accounting for a few of Byker's entities and helped with tax returns. Peggy testified that she and her husband, Edward, had the opportunity to invest in Project 5 at the end of 2005. Edward signed the Project 5 membership agreement, and Peggy wrote a check for $200,000 to cover the 3.333% interest in the $6 million project. She made the check payable to Daystar Properties (another Byker entity used as a paymaster).

Byker testified that the $6 million was used to purchase beachfront property for Project 5 and to complete Phase 1 of the development. Byker stated that there was a distinction between Project 5 and LA Developers; whereas LA Developers owned the vacant land on which Phase 2 was to be built, the members of Project 5 owned the right to participate in the development.

Byker stated that they completed the "gray work" for Project 5, which was the concrete work, site work, and water treatment plant. They also had financing approved for the construction by 2007, but then their lender "closed the window" on lending before the loan was finalized because the financial crisis struck. Byker stated that, thereafter, LA Developers became a "cash drain" because it had no income and needed cash to cover upkeep and taxes on the vacant property. Additionally, some of the investors in Project 5 were running out of patience. He bought out some investors and, in 2010, he sent a letter to the remaining investors.

On December 7, 2010, Byker handed Peggy a letter at the office. The letter was captioned "Project 5 CR, LLC Acquisition Proposal." The author indicated that, because Project 5 had "already taken much longer than we had expected or hoped, we are presenting Preferred Investors with an opportunity to sell their membership interests back to us." The author wrote that there were two reasons for the offer: uncertainty as to "financing" and the opportunity to take advantage of a low capital gains tax rate. The author opined that many investors would "like a financial projection to assist with this decision" but stated that the level of uncertainty prevented "meaningful financial projection." The author then stated "Our proposal": the author offered to purchase Peggy's interest for her original amount of $200,000 "plus 40%," which amounted to $280,000. They wrote that the terms would be 5% down payment and then 5% interest only payments each year. The author wrote that they would pay the remaining principal on

December 31, 2015. The letter was signed Dave Byker, Pat Hundley, and Ian Phair in a different typeset from that used in the remainder of the letter.[3]

Peggy testified that she thought that Byker was personally offering to purchase her interest in Project 5 because of the language in the letter and the fact that there was no mention of LA Developers. She stated that Byker did not give her any information about the viability of Project 5, and she understood the offer to be take it or leave it. She decided to take the offer.

Byker stated that he sent a similar letter to each of the remaining investors because he did not want to bankrupt the project. Byker did not believe that the letter amounted to an offer to pay a 40% premium on their investment; he characterized the offer as an offer to purchase with a 40% markup. He stated that he would have provided financial records for LA Developers had anyone asked, but no one did.

On December 31, 2010, Peggy assigned her interest in Project 5 to LA Developers and Byker caused LA Developers to accept the assignment. Notably, there was no collateral pledged or offered by LA Developers, Byker, or anyone else, to ensure the payments would be made as set forth in the December 7, 2010, offer letter. Peggy also had no access to LA Developers' financial records despite working for Byker part time. On the same day, Daystar Properties issued a check for $14,000 to cover the down payment and Byker executed a note for $266,000 on behalf of LA Developers. This is the "note" at the heart of this case.

Byker testified that he lent money to LA Developers through his Global Asset Management Holdings entity to cover the interest payments because LA Developers had no income. He eventually told the investors that he had no legal obligation to pay LA Developers' debts. Byker stated that he felt that his investors were no worse off for taking the offer; he explained that the investors traded equity for a note, and, if the equity was worthless, then so was the note.

Peggy received interest payments of $13,300 each year through 2014. With the down payment of $14,000, she received a total of $67,200. Daystar Properties made all the payments to her. She stated that Byker did not make the balloon payment required in 2015 and she sued him for the unpaid balance. She later settled her civil dispute with Byker for $225,000.

THE REGULATORY COMPLAINT AND PROCEEDINGS

Peggy filed a complaint with the Bureau in 2016, and, on October 26, 2016, the Bureau issued orders to both Byker and LA Developers to cease and desist from omitting material facts involving the offer and sale of securities. The Bureau took the position that Byker and LA Developers had, in effect, offered to sell Peggy a note in exchange for Peggy's equity in Project 5. It determined that Byker and LA Developers violated the Securities Act involving that offer. On that basis, the Bureau ordered Byker and LA Developers to each pay a $30,000 civil fine.

---

[3] Patrick Hundley was Byker's associate in Costa Rica and Patrick Ian Phair was a minority partner in Global Asset Management Holdings and managed Project 5 for LA Developers.

Byker and LA Developers asserted their right to have a hearing. Byker and LA Developers moved for summary disposition on the ground that the note at issue did not constitute a security within the meaning of the Securities Act and, for that reason, the Bureau had no jurisdiction to issue the cease-and-desist order.

On May 23, 2018, an administrative law judge issued a proposed order granting the motion for summary disposition. The ALJ examined the definition of "security" in MCL 451.2102c(c), which states that a "note" is expressly defined to be a "security" "unless the context otherwise requires." Pursuant to MCL 451.2102c,

As used in this act, unless the context otherwise requires:

***

(c) "Security" means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest in or based on the value of that put, call, straddle, option, or privilege on that security, certificate of deposit, or group or index of securities; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; an investment in a viatical or life settlement agreement; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the following apply to the term security:

(i) The term includes a contractual or quasi-contractual arrangement that meets all of the following:

(A) A person furnishes capital, other than services, to an issuer under the arrangement.

(B) A portion of the capital furnished under sub-subparagraph (A) is subjected to the risks of the issuer's enterprise.

(C) The furnishing of capital under sub-subparagraph (A) is induced by representations made by an issuer, promoter, or the issuer's or promoter's affiliates which give rise to a reasonable understanding that a valuable tangible benefit will accrue to the person furnishing the capital as a result of the operation of the enterprise.

(D) The person furnishing the capital under sub-subparagraph (A) does not intend to be actively involved in the management of the enterprise in a meaningful way.

-4-

(E) At the time the capital is furnished, a promoter or its affiliates anticipate that financial gain may be realized as a result of the furnishing.

(ii) The term includes both a certificated and an uncertificated security.

(iii) The term does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable sum of money either in a lump sum or periodically for life or other specified period.

(iv) The term does not include an interest in a contributory or noncontributory pension or welfare plan subject to the employee retirement income security act of 1974.

(v) The term includes an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor. As used in this subparagraph, a "common enterprise" means an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party, or other investors.

(vi) The term may include, as an investment contract, an interest in a limited partnership, a limited liability company, or a limited liability partnership.

Relying in relevant part on *People v Breckenridge*,[4] the ALJ determined that, under the undisputed facts, the loan at issue was a commercial loan and not a security. The ALJ recommended that the Administrator of the Securities Act grant the motion for summary disposition and dissolve the cease-and-desist order.

The Bureau took exception to the proposed order. It argued that the appropriate test to determine whether the note at issue was a security was the test the US Supreme Court stated in *Reves*. The Supreme Court summarized the "family resemblance" test as follows:

First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." Second, we examine the "plan of distribution" of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment. Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances

---

[4] 81 Mich App 6; 263 NW2d 922 (1978).

of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. [*Reves*, 494 US at 66-67 (citations and some quotation marks omitted).]

Moreover, the Bureau asserted that there were questions of fact that had to be resolved before it could be determined whether the note was a security. The Bureau argued that the Administrator had the authority to adopt the test stated in *Reves* to encourage uniformity in the application of the Securities Act, and it asked the Administrator to reject the proposed order and instructed the ALJ to hold a contested hearing to determine whether the note constituted a security using the "family resemblance" test stated in *Reves*.

On December 17, 2018, the Administrator entered an interim order agreeing with the Bureau's position. The Administrator remanded the case to the ALJ for a full evidentiary hearing and ordered the ALJ to apply the test stated in *Reves* to determine whether the note was a security. The Administrator further ordered that, if the ALJ determined that the note was a security, the ALJ should also decide whether the failure to disclose information about LA Developers' liquidity amounted to an omission of material fact.

The ALJ held a hearing on May 13, 2019, and entered a proposed final decision on December 26, 2019. The ALJ applied the test in *Reves* and determined that the note at issue was a security under that multi-factor test. Examining the first factor, the ALJ explained that the evidence showed that LA Developers wanted to delay pressure from its investors so that it could move forward with its development. The ALJ found that Peggy was also motivated to accept the offer to secure her profits in the venture. Those facts, it stated, weighed in favor of finding that the note was a security.

The ALJ also found that the evidence did not support the conclusion that the note was intended for trading, which weighed against it being considered a security under the second factor. The ALJ nevertheless found that the limited subset of the investing public—the equity investors in Project 5—reasonably believed that they were substituting one investment for another, which weighed heavily in favor of treating the note as a security. Finally, the ALJ determined that there was no other regulatory scheme that would protect the public under such circumstances. For those reasons, the ALJ stated that the Bureau had shown by a preponderance of the evidence under the *Reves* test that the note was a security. The ALJ also found that Byker and LA Developers violated the Securities Act. Consequently, the ALJ recommended affirming the cease-and-desist order. The Administrator agreed with the proposed decision, adopted it, and entered a final order to that effect on March 3, 2020.

On April 14, 2020, Byker and LA Developers appealed the final order to the circuit court. After briefing and oral argument, the circuit court entered an opinion and order on February 12, 2021, reversing the Administrator's final decision.[5] The court first opined that the Administrator

_____

[5] The circuit court's decision references the Administrator's March 6, 2020 opinion but March 6 is the date the opinion was mailed to the parties; the Administrator signed it on March 3, 2020.

did not have the authority to compel the ALJ to apply the *Reves* test under MCL 451.2608(2)(b) because this case involved a contested hearing and that statute did not apply to contested hearings. The court explained that neither it nor the ALJ was free to ignore binding precedent from this Court applying the Securities Act, and the ALJ could not rely on federal authority that conflicted with Michigan law, including *Ansorge v Kellogg*.[6] The circuit court then concluded that the *Reves* test conflicted with Michigan law on three points: Michigan law did not have a presumption that notes were securities; Michigan law did not treat a fixed rate of interest as profit; and Michigan law required a security to involve public solicitation of venture capital to be used in a business enterprise. The circuit court then analyzed the terms of the note, determined that the note was not a security under Michigan law, and reversed the Administrator's final decision.

The Bureau moved for reconsideration on March 5, 2021. It argued that the circuit court erred because MCL 451.2608(2)[7] applied to its orders, so the Administrator had the authority to apply federal law to the entry of an order to promote uniformity of law. The Bureau also argued that most jurisdictions had adopted the family-resemblance test stated in *Reves* for determining whether a note is a security. The Bureau maintained that the *Reves* test did not in fact conflict with Michigan law and should have been applied.

The circuit court allowed the parties to fully brief the issues that it raised in its opinion and order and, on September 2, 2021, the circuit court affirmed its earlier decision. The circuit court admitted that it misinterpreted MCL 451.2608(2), but it chose to affirm its earlier opinion and order. It reasoned that the decisions in *Breckenridge* and *Ansorge* remained binding interpretations of the meaning of "security" under the Securities Act because the current Securities Act retained an identical definition of "security" as the two previous acts. This appeal followed.

ANALYSIS

*REVES* AND THE FAMILY RESEMBLANCE TEST

---

[6] 172 Mich App 63; 431 NW2d 402 (1988).

[7] MCL 451.2608(2) of the Uniform Securities Act states:

> In cooperating, coordinating, consulting and sharing records and information under this section and in acting by rule, order, or waiver under this act, the administrator shall, in the discretion of the administrator, take into consideration in carrying out the public interest the following general policies:
> > (a) Maximizing effectiveness of regulation for the protection of investors.
> > (b) Maximizing uniformity in federal and state regulatory standards.
> > (c) Minimizing burdens on the business of capital formation, without adversely affecting     essentials of investor protection.

The standard of review to be applied in this case was summarized in *Polania v State Employees' Retirement Sys*:[8]

> When reviewing the agency's decision, the trial court had to determine whether the agency's decision was contrary to law, was supported by competent, material, and substantial evidence on the whole record, was arbitrary or capricious, was clearly an abuse of discretion, or was otherwise affected by a substantial and material error of law. If the agency's decision was not contrary to law and was otherwise supported by competent, material, and substantial evidence on the whole record, the trial court had to affirm the agency's decision. This Court's review in turn is limited to determining whether the trial court properly applied those principles: we must determine whether the trial court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's findings. [Quotation marks and citations omitted.]

Furthermore, we review de novo whether the circuit court properly interpreted and applied the relevant law.[9]

Although we are called upon to interpret the Securities Act and the meaning of "security," we cannot do so in a vacuum. The Securities Act was adopted in 2008, with an effective date of October 1, 2009.[10] This act replaced the 1964 Securities Act ("the 1964 Act"), which in turn had replaced Michigan's 1929 blue-sky law.[11] At the heart of this dispute is the accusation that LA Developers and Byker directly or indirectly omitted "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," which is unlawful under MCL 451.2501(b) when done "in connection with the offer, sale, or purchase of a security."[12] Thus, the question is whether the promissory note dated December 31, 2010, was a "security" under the Securities Act, resulting in application of MCL 451.2501(b).

In addressing this question, the ALJ applied the test in *Reves* and determined that the note was a security. But the circuit court reversed, concluding that the *Reves* test was inapplicable under Michigan law and determined that the promissory note was not a security. There are no

---

[8] 299 Mich App 322, 328; 830 NW 2d 773 (2013).

[9] See *Pransky v Falcon Group, Inc*, 311 Mich App 164, 173; 874 NW2d 367 (2015).

[10] 2008 PA 551.

[11] See *People v Dempster*, 396 Mich 700, 704; 242 NW2d 381 (1976).

[12] MCL 451.2501(b) states in pertinent part, "It is unlawful for a person, in connection with the offer, sale, or purchase of a security or the organization or operation of a Michigan investment market under article 4A, to directly or indirectly do any of the following: . . . (b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

cases in Michigan addressing whether the *Reves* test should be applied to the Security Act when determining if a note is a security. This is the question we must answer.

The Legislature provides an extensive definition of "security" in MCL 451.2102c:

As used in this act, unless the context otherwise requires:

(c) "Security" means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest in or based on the value of that put, call, straddle, option, or privilege on that security, certificate of deposit, or group or index of securities; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; an investment in a viatical or life settlement agreement; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the following apply to the term security:

(i) The term includes a contractual or quasi-contractual arrangement that meets all of the following:

(A) A person furnishes capital, other than services, to an issuer under the arrangement.

(B) A portion of the capital furnished under sub-subparagraph (A) is subjected to the risks of the issuer's enterprise.

(C) The furnishing of capital under sub-subparagraph (A) is induced by representations made by an issuer, promoter, or the issuer's or promoter's affiliates which give rise to a reasonable understanding that a valuable tangible benefit will accrue to the person furnishing the capital as a result of the operation of the enterprise.

(D) The person furnishing the capital under sub-subparagraph (A) does not intend to be actively involved in the management of the enterprise in a meaningful way.

(E) At the time the capital is furnished, a promoter or its affiliates anticipate that financial gain may be realized as a result of the furnishing.

(ii) The term includes both a certificated and an uncertificated security.

(iii) The term does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable sum of money either in a lump sum or periodically for life or other specified period.

(iv) The term does not include an interest in a contributory or noncontributory pension or welfare plan subject to the employee retirement income security act of 1974.

(v) The term includes an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor. As used in this subparagraph, a "common enterprise" means an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party, or other investors.

(vi) The term may include, as an investment contract, an interest in a limited partnership, a limited liability company, or a limited liability partnership.

At first blush, it would seem that this case can be easily decided inasmuch as the definition of "security" under the statutes starts its long list with the word "note." While it would be convenient to end the analysis there, we cannot because the introductory sentence to MCL 451.2102c qualifies all the definitions in the section with phrase "unless the context otherwise requires." Therefore, we must determine whether the context does indeed require otherwise.

Our task is hampered by the fact that there is a lack of caselaw interpreting the definition under the current Securities Act. There are, however, cases addressing the definition of "security" under the 1964 Act, which similarly provided that "security" includes "any note" unless the context requires otherwise.[13] Moreover, a mandated goal of the Securities Act, as expressed in MCL 451.2608(2)(b), is for the administrator, "in acting by rule, order, or waiver under this act" to "take into consideration in carrying out the public interest" to maximize "uniformity in federal and state regulatory standards." There is a compelling reason for the Administrator to determine that it is appropriate to apply *Reves* when interpreting whether a promissory note meets the definition of a "security": to ensure uniformity in regulatory standards. As the circuit court recognized in its opinion, it was "within the discretion of the Administrator of the Bureau to order the Administrative Law Judge to reconsider his original proposed final decision to, among other things, take into consideration the factors articulated in" *Reves*.

The circuit court also noted that applying *Reves* would promote uniformity with the federal government and with other states; the parties did not contest this part of the Administrator's remand. But the circuit court concluded that the *Reves* decision is inconsistent with Michigan law, specifically Michigan caselaw decided under the prior act. Therefore, the primary question before us is whether the circuit court erred in determining that the *Reves* test is inconsistent with Michigan law.

---

[13] See the now repealed MCL 451.801(z).

-10-

The circuit court observed what it found to be three "significant differences" between Michigan caselaw and *Reves*. First, Michigan does not presume that a note is a security. Second, that Michigan does not consider a fixed interest rate in a promissory note to be a "profit". And, third, that a "salient feature" of Michigan's definition of a security includes that it is a public solicitation of venture capital.[14]

In *Reves*, the US Supreme Court reviewed a number of tests developed in the lower courts to determine whether an instrument is a "security." It ultimately settled on a modified version of the family-resemblance test developed by the Second Circuit.[15] In its analysis, the Supreme Court began "with a presumption that every note is a security."[16] This is the first point upon which the circuit court balked at applying the *Reves* family-resemblance test in Michigan. But the circuit court's opinion does not identify any caselaw that rejects such a presumption. Rather, it states that "nothing in the Michigan uniform securities act . . . suggests that the Legislature intended to create a presumption that promissory notes are securities." The circuit court's analysis overlooks how *Reves* found the presumption to exist in the first place. The Supreme Court said that the presumption exists "because the Securities Acts define 'security' to include 'any note' . . . ."[17] Similarly, the Michigan statute defines "security" to include "a note."[18] So, just as the presumption under federal law arises from the federal statute, the same presumption arises from the state statute. But we do view the presumption of a note being a security as merely a beginning point of the analysis. That is, the analysis starts from the point that the note is a security and then the court must proceed to determine whether the context requires otherwise.

The circuit court's second point is that Michigan law conflicts with *Reves* regarding whether a fixed rate of interest is considered a "profit." The circuit court, like petitioners, relies on *Ansorge* in support of this proposition. But that reliance is misplaced. First, that decision is not binding on this Court because it was decided before November 1, 1990.[19] The *Ansorge* Court held that because promissory notes were given in exchange for cash and those notes were interest bearing at a fixed interest rate, the transactions were loans rather than investments.[20] But the *Ansorge* decision was limited to the transactions at issue in that case involving cherry growers and the fruit processing company that issued the promissory notes to the growers, with the Court

---

[14] See *Ansorge*, 172 Mich App at 69.

[15] *Reves*, 494 US at 63, 65.

[16] *Id*. at 65.

[17] *Id*.

[18] There is no meaningful distinction between the federal statute using "any" and our statute using "a." See Garner, *Garner's Dictionary of Legal Usage* (3rd ed), p 66 ("*Any* is greatly overworked in statutes . . . . Usually, replacing *any* with the indefinite article *a* or *an* results in heightened readability with no change in meaning.")

[19] MCR 7.215(J)(1).

[20] *Ansorge*, 172 Mich App at 71.

observing that the return on those transactions was not dependent on the issuer's profits.[21] *Ansorge* did not hold that fixed-rate interest can never be considered "profit" and, therefore, an investment transaction.

In *Reves*, the Supreme Court observed that the demand notes at issue were sold by a farmer's cooperative "in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest."[22] Indeed, "one of the primary inducements offered purchasers was an interest rate constantly revised to keep it slightly above the rate paid by local banks and savings and loans."[23] Thus, "the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction."[24] Moreover, *Reves* pointed out that the notes at issue were offered over an extended period of time to a large number of people, including to "a broad segment of the public."[25]

We do not read *Reves* as focusing on whether a fixed rate of interest, or even a floating rate of interest, constitutes a "profit." Nor, for that matter, is it relevant to this case whether Michigan law does so or not. Rather, we read this discussion in *Reves* as directing the analysis to the entire nature of the transaction and determining whether the transaction looks like a business investment or a purely commercial or consumer transaction. With this in mind, how the notes at issue in this case provide income or a return on investment to the holders of those notes might well affect the analysis under the *Reves* test and the ultimate determination whether those notes are a "security." But it does not affect whether the *Reves* test is consistent with Michigan law. In other words, to the extent the circuit court concluded that how Michigan views a fixed rate of interest as a "profit" is a reason to reject the *Reves* test, the circuit court was mistaken. Rather, this may be taken into consideration when applying the *Reves* test and determining whether the notes are a "security."

The circuit court's third point in concluding that *Reves* is inconsistent with Michigan law is that the "'salient' feature of a security sale in Michigan" is the public solicitation of venture capital, quoting *Ansorge*. The circuit court did not explain, however, how this is inconsistent with the *Reves* test.

For these reasons, we conclude that the circuit court erred in concluding that the *Reves* test is inconsistent with Michigan law. But concluding that *Reves* is consistent with Michigan's statute is not the same as concluding that the *Reves* test should be adopted in determining whether an instrument is a "security" under the Michigan statute. Turning to that question, we conclude that we should, in fact, adopt the *Reves* test. The Michigan statute employs similar language as the

---

[21] *Id*. at 70.

[22] 494 US at 67-68.

[23] *Id*. at 68.

[24] *Id*.

[25] *Id.*

federal statute and adopting the *Reves* test would further the legislative goal of promoting uniformity in federal and state standards.[26] As this Court observed in *Breckenridge*:[27]

> While the interpretation Federal courts have placed upon terms under the Federal securities acts is not binding upon state courts as they interpret the Uniform Securities Act, the similarity of the purpose and provisions of the state and Federal securities statutes, particularly those purposes and provisions pertinent to the facts at hand, cannot be ignored. Interpretation of one offers valuable guidelines as to the interpretation of the other.

The family resemblance test stated in *Reves* is consistent with Michigan law and better serves the plain language of the Legislature's definition. There is a sound foundation for creating a presumption that notes are securities. The Legislature specifically defined the term "security" to include "a note"[28] and, were it not for the Legislature's statement that the definition applies unless the context requires otherwise, this Court would be bound to respect the Legislature's decision to subject every note to the Securities Act. The presumption adopted by the United States Supreme Court respects the Legislature's decision to include notes in the definition of security. It is also consistent with our Legislature's choice to place the burden on the party claiming an exemption, exception, preemption, or exclusion from application of the Securities Act to prove the applicability of that exemption, exception, preemption, or exclusion.[29]

Nevertheless, consistent with the Supreme Court's statement about the Securities Act of 1933,[30] this Court has recognized that our Legislature did not intend to regulate every note under the 1964 Securities Act.[31] Rather, our Legislature crafted a regulatory scheme that was designed to protect investors from fraud involving investments.[32] Accordingly, a party ought to have the opportunity to rebut the presumption that a note is a security subject to the Securities Act by demonstrating that issuance of the note did not involve an investment transaction but instead involved an ordinary loan transaction.[33]

APPLYING THE FIVE-FACTOR TEST IN MCL 451.2102

---

[26] MCL 451.2608(2)(b).

[27] 81 Mich App at 16-17.

[28] MCL 451.2102c(c).

[29] See MCL 451.2503.

[30] See *Reves,* 494 US at 62-63.

[31] See *Ansorge*, 172 Mich App at 68.

[32] See, e.g., MCL 451.2501; MCL 451.2502; see also *People v Breckenridge*, 81 Mich App at 14 (stating that courts must look beyond the labels and devices employed by the parties to determine the real intent and purpose of the parties).

[33] See *Ansorge*, 172 Mich App at 70.

We now turn to Byker and LA Developers's argument regarding the five factors stated under former MCL 451.801(z), and now found under MCL 451.2102c(c). In pertinent part, it reads :

All of the following apply to the term security:

(i) The term includes a contractual or quasi-contractual arrangement that meets all of the following:

(A) A person furnishes capital, other than services, to an issuer under the arrangement.

(B) A portion of the capital furnished under sub-subparagraph (A) is subjected to the risks of the issuer's enterprise.

(C) The furnishing of capital under sub-subparagraph (A) is induced by representations made by an issuer, promoter, or the issuer's or promoter's affiliates which give rise to a reasonable understanding that a valuable tangible benefit will accrue to the person furnishing the capital as a result of the operation of the enterprise.

(D) The person furnishing the capital under sub-subparagraph (A) does not intend to be actively involved in the management of the enterprise in a meaningful way.

(E) At the time the capital is furnished, a promoter or its affiliates anticipate that financial gain may be realized as a result of the furnishing.

This Court has stated, under the previous statute, that those factors are appropriate aids in determining whether a note should be considered a security.[34] But, contrary to the argument by Byker and LA Developers on appeal, the Legislature provided that those factors were applicable only to determining whether a contractual or quasi-contractual arrangement should be deemed a security.[35] The Legislature did not establish that five-factor test as a means for limiting when a note (or any other enumerated instrument) should be deemed a security. If the five-factor test were intended to be applied to all instruments to determine if they are a "security," there would be no need for the Legislature to provide such as extensive list of items that are securities. Rather, it would merely have set forth the five-factor test. It is clear that the Legislature recognized that, regardless of how exhaustive the list might be, it is always possible that some instrument was overlooked, or even yet to be invented, that should be deemed a security.

---

[34] See *Ansorge*, 172 Mich App at 70.

[35] See MCL 451.2102c(c)(*i*) (stating that the "term security" *includes* a contractual or quasi-contractual arrangement that meets the five-factor test).

-14-

This Court's decision in *Noyd v Claxton, Morgan, Flockhard & VanLiere*[36] presents an example of this. The Court considered whether transactions described as "loan participation agreements" came within the mean of "security" under the 1964 Act. A "loan participation agreement" is not listed in the statute. Accordingly, the *Noyd* Court looked to the five-factor test to determine if those agreements were securities, concluding that they were not.[37] We recognize that *Noyd* does not state that the five-factor test must be applied to all instruments, even those specifically listed in the statute.

Assuming that the decisions in *Breckenridge* and *Ansorge* should be understood to require that the circuit court apply the five factors this Court identified in *Ansorge*, this Court is not bound to apply those factors. The decisions in *Breckenridge* and *Ansorge* are merely persuasive, not binding.[38] And, to the extent that they can be understood to require courts to apply the five-factor test now stated under MCL 451.2102c(c) in all cases, we are not persuaded. In both cases, this Court did not analyze the language of the statute at issue. The Legislature provided that the term "security" included a "contractual or quasi-contractual arrangement" that met all the elements of a five-part test.[39] By stating that the term "security" "includes a contractual or quasi-contractual arrangement" that met the test, the Legislature indicated its intent that the five-part test in MCL 451.2102c(c)(i) apply only to contractual or quasi-contractual arrangements that did not otherwise fall within one of the previously enumerated categories. Therefore, to the extent that this Court in *Breckenridge* and *Ansorge* interpreted the five-part test as a legislative *limit* on the inclusion of notes within the definition of security, that interpretation was erroneous. Rather, the five factors as they relate to contractual or quasi-contractual arrangements are meant to elaborate on, not limit, the definition of "security." Indeed, it is worth noting that the current statute states that the term "security" "includes" those arrangements;[40] it does not state that it "only includes" or "means" arrangements that meet the five-factor test.

The express language of MCL 451.2102c(c)(*i-vi*) also provides support for the proposition that the Legislature was trying to capture (and distinguish) all instruments that could be a "security." Subsections (*i*), (*ii*), and (*v*) all refer to "security" as a term that "includes" everything described therein: contractual or quasi-contractual arrangements, a certificated and uncertificated security, and an investment in a common enterprise where the profits will be derived from efforts of someone other than the investor. Subsections (*iii*) and (*iv*) identify that the term "security" does *not include* insurance or endowment policy or annuity contracts or interest in a contributory or noncontributory pension plan. Subsection (*vi*) then specifies that "security" *may include* an interest in a limited partnership, limited liability company or limited liability partnership as an investment contract. Indeed, the Legislature cast a wide catch-all net in drafting MCL

---

[36] 186 Mich App 333; 463 NW2d 268 (1990).

[37] *Id*. at 339.

[38] See MCR 7.215(C)(2), (J)(1).

[39] See MCL 451.2102c(c)(*i*); cf. MCL 451.801(z).

[40] MCL 451.2102c(c)(i).

-15-

451.2012c(c)(*i-vi*), and we reject the notion that (c)(*i*)(A-E) is a sieve through which everything listed after the word "security" in MCL 451.2102c(c) should be tested.

In sum, as the United States Supreme Court aptly stated in *Reves*, applying a test for an entirely different variety of instrument would render superfluous the Legislature's decision to enumerate notes as a type of instrument that constitutes a security.[41] We reject that approach for the same reason. As *Reves*[42] observed:

> In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *SEC v W J Howey Co*, 328 US 293, 299; 66 S Ct 1100, 1103; 90 L Ed 1244 (1946), and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' " *Forman, supra*, 421 US at 847–848; 95 S Ct at 2058–2059 (quoting HR Rep No. 85, 73d Cong., 1st Sess, 11 (1933)). Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment. [Footnote omitted.]

Similarly, we read the five-factor test in MCL 451.2102c(c)(*i*)(A-E) as applying only to contractual and quasi-contractual arrangements that otherwise do not fall within the list of instruments that the Legislature identified as securities. It is our Legislature painting with its own broad brush in MCL 451.2102c(c)(*i-vi*) to capture all forms of potential investments that should be considered a "security." The statutory language is not designed to limit the definition. Concerning notes specifically, a note is a security when intended to serve the function of an investment and is not a security when intended as an ordinary consumer or commercial loan.[43] We therefore conclude that the *Reves'* family resemblance test best serves the goal of ascertaining whether a note is a security under the Securities Act.

Having concluded that the circuit court erred when it determined that the *Reves* family resemblance test contravened Michigan law and also erred when it determined on that basis that the ALJ misapplied the law, it still must be determined whether the Bureau properly applied the *Reves* test. Byker and LA Developers argue that this Court should uphold the circuit court's decision to reverse because there was no evidence to support the ALJ's determination that the note at issue was a security under the *Reves* test. But we find it inappropriate to address that issue without first giving the circuit court the opportunity to do so. Having established that *Reves* is the

---

[41] See *Reves*, 494 US at 64.

[42] *Id*. at 60-61.

[43] Cf. *Ansorge*, 172 Mich App at 70 (stating that the factors are relevant as an aid to determining whether a transaction was an investment transaction or a loan transaction). And, while potentially providing assistance, use of the five-factor test is not mandatory.

appropriate test, the parties, as well as the circuit court, should have the opportunity to address the evidence and analyze the factors of the test more fully.

Accordingly, we reverse the judgment of the circuit court and remand the case to the circuit court for reconsideration of this matter in light of our adoption of the *Reves* family resemblance test to determine if the notes at issue are a "security" under MCL 451.2102c(c) and for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs, a public question involved.

/s/ Kathleen A. Feeney
/s/ Douglas B. Shapiro
/s/ Anica Letica